810 A.2d 1211

**COMMONWEALTH of Pennsylvania, Respondent**

**v.**

**Jerry J. MARSHALL, Jr., Appellant.**

Supreme Court of Pennsylvania.

Submitted April 5, 1999.

Decided Nov. 22, 2002.

546

Robert Brett Dunham, Philadelphia, for appellant, Jerry Marshall.

Catherine Marshall, Philadelphia, for appellee, Com. of PA.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Chief Justice ZAPPALA.

Appellant, Jerry J. Marshall, Jr., appeals from the order of the Common Pleas Court of Philadelphia denying relief under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. § 9541 *et seq.* For the following reasons, we affirm the order of the common pleas court (PCRA court).[1]

Appellant was convicted of murdering his wife and daughter and he is currently awaiting execution of a sentence of death for that crime. *Commonwealth v. Marshall,* 534 Pa. 488, 633 A.2d 1100 (1993). Thus, Appellant has demonstrated that he meets the requirements of 42 Pa.C.S. § 9543(a)(1)(ii)(requiring PCRA petitioner to demonstrate that he has been convicted of a crime and is awaiting execution of a sentence of death.).

In addition to the requirements of 42 Pa.C.S. § 9543(a)(1), a PCRA petitioner must also demonstrate that the conviction or sentence was the result of one of the errors or constitutional violations enumerated in 42 Pa.C.S. § 9543(a)(2), that the error has not been waived or previously litigated per 42 Pa.C.S. § 9543(a)(3), and that the failure to litigate the issue prior to or during trial, or on direct appeal could not have been a rational, strategic or tactical decision by counsel per 42 Pa.C.S. § 9543(a)(4).

---

1. This appeal is within this Court's exclusive appellate jurisdiction. *See* 42 Pa.C.S. § 722(4).

■ Appellant's initial claim is that the PCRA court erred in finding this petition an untimely second PCRA petition because the common pleas court previously erred in requiring him to raise claims of counsel's ineffectiveness in the form of a PCRA petition, concurrent with Appellant's post-verdict motions. We agree. This Court addressed all of the claims raised at the time of Appellant's direct appeal. *See* 534 Pa. 488, 633 A.2d 1100. However, we do not consider those motions as a PCRA petition because, PCRA petitions must be filed "one year of the date the judgment becomes final." 42 Pa.C.S. § 9545(b)(1); and also Pa.R.Crim.P. 901(a). As, for these purposes, a judgment becomes final **at the conclusion of direct review** per 42 Pa.C.S. § 9545(b)(3), the previous proceedings, despite being labeled as PCRA proceedings, could not have been Appellant's first PCRA petition. Thus, under the circumstances and particular procedure of this case, we proceed to analyze the current appeal as if it resulted from a timely first petition for relief under the PCRA.

We initially note that, in order for Appellant to demonstrate that he was ineffectively represented by counsel, Appellant must satisfy our three-prong test. There must be merit to the underlying claim; counsel must have no reasonable basis for his or her conduct, either by acting or failing to act; and also that there is a reasonable probability that, but for counsel's action or omission, the outcome of the proceeding would have been different. *See Commonwealth v. Hawkins,* 567 Pa. 310, 787 A.2d 292 (2001).

■ Appellant argues that all appellate counsel were ineffective for failing to litigate Appellant's claim of racially biased jury selection. In order to establish a *prima facie* case of racial discrimination in jury selection, the defendant must make a record identifying the race of venirepersons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury. *See Commonwealth v. Gibson,* 547 Pa. 71, 688 A.2d 1152, 1158–59 (1997); *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621 (1995), and *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d

69 (1986). Appellant relies on a statistical analysis which indicates that African–American prospective jurors were struck by the prosecution using peremptory challenges at a greater rate than white jurors.

The PCRA court noted that Appellant failed to supply the court with a record of the race of prospective jurors acceptable to the Commonwealth, but stricken by the defendant or the racial composition of the final jury. Appellant does not now purport to correct this failure, instead stating that "the record evidence fails to support [the PCRA court's] conclusions." Appellant's Supplemental Brief at 47. Thus, Appellant is arguing that the record is insufficient for the PCRA court to determine that the record was insufficient. As Appellant bears the burden of producing this record, his claim must fail.

Additionally, our review of the venire record does not show that the peremptory strikes were racially motivated. In fact, when objecting to the exclusion of African–American men from the jury, trial counsel stated:

> With respect to the other witness that the Commonwealth— the one proceeding [sic] this other one right here, I think the record also should reflect that he was a black male, **probably the only black male so far that was qualified to sit on this Jury,** and the Commonwealth exercised its peremptory strike.

N.T. 9/28/1989 at 40 (emphasis added). There was no record developed regarding the Commonwealth's reasons for striking this venire person and therefore, we cannot find that this potential juror was dismissed because of racial bias.[2] Therefore, we cannot find that previous appellate counsel was ineffective for failing to pursue this argument.

**2.** While we will not speculate as to why the Commonwealth struck this witness, we note that this juror indicated that he had previously served on a jury, that deliberations in that case were lengthy, and when the prosecutor asked, "was it an unpleasant experience?" The potential juror answered, "Yes, it was ... a lasting one. A lasting experience, I mean." N.T. 9/28/1989 at 34 (ellipses in original).

Appellant next argues that the trial court erred in failing to strike a juror for cause during venire. This issue has already been fully and finally litigated it is not a cognizable claim pursuant to the PCRA. 633 A.2d at 1104.

Similarly, Appellant claims that another juror who was seated on the jury should have either been struck for cause or peremptorily struck by trial counsel because the juror's daughter's fiancé was murdered in a crime unrelated to the present case. This issue was also fully and finally litigated, and we noted in our previous opinion that trial counsel's reasons for not using a peremptory strike for this juror were part of the record. 633 A.2d at 1104.

Appellant also argues that another juror should have been dismissed because he displayed an inability to assure the court he could deliberate in a fair and impartial manner and that he displayed a "zeal for imposing the death penalty." We do not believe this claim to be borne out by a reading of the record. The record reveals the following exchange between the prosecutor and the juror during venire:

[Prosecutor] Q. is there anything about that process, the fact of you being a juror [in a previous unrelated case with difficult deliberations] that would give you any problems about being fair in this case?

A. Well, I think that—I mean the charge here is a little different than . . .

Q. It is two counts of murder.

A. Yeah, that's what I mean. It is, it's not so much the murder charge but I mean with children that are involved. I mean I am a father and everything and I think it would put me . . .

Q. Well, those are serious charges and the victims are a woman—well, a woman and a girl.

A. Nine-year-old daughter, I mean I can't . . .

Q. Can you put aside any bias you might have about that?

A. I guess I could, when I heard the evidence it would be a different story. But I mean from what, you know, what you

see and are reading these days about these abusing children and everything. I can't see that myself.

Q. Well, I understand, anyone who hears about the death of a child I think is going to be upset, but notwithstanding your being upset would you put that aside and listen to the evidence and be fair?

A. I think I could. I think so.

Q. The Commonwealth is seeking the death penalty in these cases. So I ask you, do you have any religious, moral, philosophical or any personal beliefs that would prevent you from considering the death penalty in the appropriate case?

A. No, I could, if I thought the man was guilty enough I wouldn't have no problem.

Q. Well it is not just a question of guilty enough, you would have to follow the instructions on the law that the Judge gave you. Could you do that?

A. Hmm.

Q. Could you follow those instructions on the law?

A. Yeah, sure.

Q. Well, you would try and be a fair guy, as fair as you can be?

A. Absolutely.

N.T. 9/27/1989 at 190–91. The prosecutor and trial counsel found this juror to be acceptable at that time. This juror gave no indication that he would be unable to follow the law or that he was biased or predisposed to the death penalty.

Another issue regarding a juror's qualifications arose during opening statements of the penalty phase. When the prosecutor indicated that Appellant's prior criminal history would be an element, a juror informed an officer of the court that she might have difficulty in continuing, as she had been the victim of a similar crime. This issue was previously fully and finally litigated and this Court found that Appellant did not demonstrate that he was prejudiced by the juror's continued service, counsel's failure to object, or the court's decision to continue with that juror. 633 A.2d at 1108–09. This claim is therefore not cognizable under the PCRA.

Appellant argues that the jury was not properly "life quali-
fied", for two reasons. First, because the trial court did not
permit trial counsel to pursue this type of questioning. Sec-
ond, because trial counsel's *voir dire* of the potential jury
members was ineffective and all previous counselors were
ineffective for failing to raise and litigate this issue. This
issue does not have merit.

██ First, we note that we have consistently found that

[t]he mere fact that counsel may not have posed the specific
question as to whether a prospective juror would vote for a
sentence of life imprisonment in an appropriate case does
not justify the conclusion that counsel failed to assure that a
fair and impartial jury was selected. Such a talismanic
requirement would clearly place form over substance.

*Commonwealth v. Jermyn*, 516 Pa. 460, 533 A.2d 74, 87 (1987);
*see also Commonwealth v. Blount*, 538 Pa. 156, 647 A.2d 199,
203–04, (1994), *and Commonwealth v. Tilley*, 528 Pa. 125, 595
A.2d 575, 587 (1991). Thus, we do not find that trial counsel
was ineffective for failing to question jurors about whether
they would have a predisposition to vote for the death penalty
where the jurors otherwise have indicated that they will follow
the law as instructed by the judge, and that they will be fair
and impartial jurors.

In *Commonwealth v. Blount*, 538 Pa. 156, 647 A.2d 199
(1994), we distinguished and interpreted *Morgan v. Illinois*,
504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). The
United States Supreme Court in *Morgan* held that the trial
court must not restrict *voir dire* in a way that limits the
defendant's "ability to exercise intelligently his complementary
challenge for cause against those biased persons on the venire
who as jurors would unwaveringly impose death after a find-
ing of guilt." 504 U.S. at 732, 112 S.Ct. 2222. This distinction
is the foundation for the second portion of Appellant's claim,
i.e., that the trial court's sustaining of objections to trial
counsel's *voir dire* questions was a Constitutional violation.
Our examination of the record reveals this is not the case

here. In the example cited by Appellant, the following exchange occurred:

Q. Have you ever served on a jury before?

A. Yes.

Q. And was that a civil case or a criminal case?

A. Criminal.

Q. And without telling us the verdict, did the jury in fact reach a verdict?

A. Yes.

Q. Now, in this case the prosecution is seeking the death penalty. How do you feel about the death penalty?

[Prosecutor] Well, I am going to object to that question as formed.

Q. Well, do you favor the death penalty?

[Prosecutor] I will object to that question as to its form too.

The court: Sustained.

**Q. Do you oppose the death penalty?**

**A. I would have to weigh the evidence.**

Q. What kind of cases come to your mind when you think in terms of imposing the death penalty?

The Court: I will have to sustain that.

[Prosecutor]: I would object to that as well, Your Honor.

[Trial Counsel]: I have no further questions, Your Honor.

N.T. 9/26/1989 at 32–33 (emphasis added). Contrary to Appellant's assertion that the trial court restricted venire unconstitutionally, trial counsel was able to and did indeed question this potential juror regarding capital punishment, when the question was on point and properly phrased.

Appellant next argues that the Commonwealth withheld several pieces of evidence contrary to the mandates of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that all previous counsel were either unaware of the evidence or ineffective for failing to pursue this issue. The first piece of evidence allegedly withheld was the drug

abuse of Commonwealth witness Brecher.[3] Appellant argues that he was not informed of the drug history and unreliability of Brecher. This claim is without merit. Appellant knew of Brecher's drug use, because they frequently abused drugs together. *See* 633 A.2d at 1102–03. Furthermore, at trial, Brecher was questioned on direct and cross-examination regarding his drug use. N.T. 10/5/1989 at 926–54.

■ Appellant also argues that Brecher was interviewed and gave the police three separate statements. Only two of these statements were given to the defense. Appellant's only evidence that a third statement existed is Brecher's affidavit dated July 14, 1997. Brecher's affidavit recounts:

I remember the first statement they took from me. I was really scared of getting into trouble myself and of vomiting—or worse—at the police station, so I didn't tell them anything about meeting up with Jerry that Wednesday afternoon. I was afraid that if I told them anything about seeing Jerry, I would definitely go to jail. The officers wrote up what I said and I signed it.

They kept on questioning and threatening me though and so I finally told them about meeting up with Jerry and giving him some money to get away. The officers wrote this up into a statement as well and I remember signing it. They seemed satisfied at that point, and an officer game me a ride home.

As soon as I got home, I took some more [drugs] and got high again. Then a few hours later, the police were back at my door and they took me back down to the Roundhouse. I told them I was high but they didn't seem to care, just like the first time. The officers kept on asking the same questions over and over and threatening me with going to jail. They made me sign another statement and then they let me go.

Brecher affidavit, Appellant's Appendix § 18, ¶ 13–15. Appellant argues that had the first signed statement been given to

3. Brecher's involvement with Appellant at the time of the murders as well as Brecher's role at trial are described in *Commonwealth v. Marshall*, 534 Pa. 488, 633 A.2d 1100 (1993).

the defense, Appellant would have been able to impeach Brecher's trial testimony, especially since the first statement denies any meeting between Appellant and Brecher following the murders. The PCRA court concluded that only two statements were given and Brecher's memory was clouded by the passage of time and drug abuse. PCRA ct. mem. at 10.

We find that even if there was a third statement, in the present case Appellant fails to demonstrate that the Commonwealth suppressed the statement. Appellant also fails to demonstrate that the statement was material and exculpatory. We are asked by Appellant to accept, as truth, Brecher's current affidavit. In this statement, Brecher admits to lying in the alleged first undisclosed statement; the rest of the affidavit is consistent with his previous disclosed statements and trial testimony. Therefore, we do not find that Appellant has demonstrated a *Brady* violation.

Appellant also argues that Brecher's affidavit indicates that he had been taking drugs prior to speaking to the police and granting the police the first, undocumented, statement. As noted above, this was a factor in the PCRA court's determination that Brecher was confused regarding the circumstances of his interview and the existence of a statement. Appellant, however, claims that the fact that Brecher's drug use prior to granting a statement, that's existence is only asserted in his affidavit is, in itself, a *Brady* violation because the prosecution did not disclose Brecher's condition while giving the interview. This argument does not have merit.

▇▇▇▇ Following the murders, Appellant fled Pennsylvania. He was arrested on May 23, 1987, in Charleston, South Carolina. *See* 633 A.2d at 1103. Appellant argues that the Commonwealth suppressed the names and addresses of witnesses who would have testified during sentencing, that

[w]hile in South Carolina, Appellant led an exemplary life: he held down a steady job and won the accolades of his employer; he was a loving son, brother, and uncle to his paternal family members; and was a warm and loving

companion to Vera Breland and an important role model for her children.

Appellant's brief at 29. Appellant also argues that if this information was not suppressed by the Commonwealth, then it was not investigated or presented as mitigating evidence through the ineffectiveness of counsel and that all subsequent counsel were ineffective for failing to pursue this issue.

First, we cannot find that the Commonwealth suppressed or withheld information regarding Appellant's time spent in South Carolina. Information regarding where and with whom he stayed, and where and by whom he was employed during this time was within Appellant's own personal knowledge. Nor can we fault counsel for failing to develop or present this information. We find that, the rational basis for counsel not arguing Appellant's "exemplary life" as a loving family member, companion, employee, and role model, is evident when we review the argument that would have been made. Counsel, would have needed to make that argument before a jury which had just convicted Appellant of brutally murdering his own wife and daughter for drug money. We will not fault trial counsel for not emphasizing that Appellant was an interstate fugitive for several months.

Appellant argues that trial counsel was ineffective for failing to present evidence of Appellant's diminished capacity or mental impairment at the time of the murder and that all previous counsel were ineffective for failing to litigate this issue. Contrary to this assertion, trial counsel investigated Appellant's mental state and was informed that there were no signs of major mental illness, organic brain disease, or other malady which Appellant now complains.

█ On direct appeal, Appellant argued that the trial court erred in refusing to instruct the jury that his drugged condition could negate the specific intent to kill. 633 A.2d at 1104. We addressed that issue as follows:

It is true that voluntary intoxication can reduce the crime of murder from first to third degree. In order to be entitled to a charge of voluntary intoxication, however, there must

be evidence in the case sufficient to place appellant's mental condition in issue. *Commonwealth v. Rose,* [457 Pa. 380,] 321 A.2d 880 ([Pa.] 1974). The evidence must show that appellant was so "overwhelmed or overpowered by [drugs] to the point of losing his faculties or sensibilities" at the time the crime was committed. *Commonwealth v. Tilley,* [528 Pa. 125,] 595 A.2d 575, 580 ([Pa.] 1991).

Instantly, appellant produced no evidence to support his contention that he was in a drugged condition at the time of the murders. While it is true that a defendant can rely on the testimony of Commonwealth witnesses to support such an assertion, in the instant case there was simply no evidence given by anyone to support the claim. At the time of the murders, the only people present were Mr. and Mrs. Marshall and their children. No one else had seen appellant since the night before the murders. Although his stepdaughter, Ayesha, testified that she saw him inject cocaine *after* the murders, no one testified that he took drugs just prior to committing the crimes. The first person to see Mr. Marshall after the murders was Lyla Jenkins, the woman who watched the children for several days. Ms. Jenkins testified that Mr. Marshall did not appear to be drunk, high, or in any kind of altered condition when he left the children with her. Several other people testified that they saw appellant in the hours and days *after* the murders, and that he appeared to be under the influence of drugs *at those times.* Several witnesses also testified that appellant had a drug addiction problem, before and after the murders. This testimony, that appellant was in an altered state *after* the murders, and that he had a drug addiction problem, does not demonstrate or place in issue the question of whether he was in fact in an altered state *when he committed* the murders.

633 A.2d at 1104–05. Appellant now faults trial counsel for either not finding evidence to support a diminished capacity defense, or for failing to present such evidence. Appellant presents the affidavit of Veronica Robichaus, Appellant's neighbor at the general time of the murders, who stated that

Appellant appeared at her door "[l]ate one night in May 1987." Robichaus states that he was sweaty, breathing hard and having trouble standing up. Because Appellant was mumbling really loud, Robichaus could not understand Appellant. She told Appellant that she was on her way out and did not have time to talk. She closed the door and hoped Appellant would be okay. She further states in her affidavit that, "[a] few days later I hear that the [victims] had been killed .... and that they'd been dead for a couple of days before the police found their bodies. I realized the night I saw Appellant must have been the night before the murders." Robichaus Affidavit, Appellant's Appendix § 24, ¶¶ 3–6.

Appellant's argument that counsel was ineffective for failing to present Robichaus must fail. Contrary to Appellant's representation of the testimony, this affidavit contains nothing which indicates that Appellant was under the influence of drugs at the time of the murders. Robichaus merely states that she saw Appellant in an altered state "late one night in May," and that "must have been the night before the murders." *See id.* As this testimony does not provide any temporal context which would indicate that Appellant was in a drugged condition at the time of the murders as opposed to a time prior to, or a time following the murders, counsel could not have been ineffective for failing to discover the evidence or to present it at trial.

Appellant argues that counsel was ineffective for failing to investigate and or present evidence of Appellant's brain damage in order to promote a defense of diminished capacity and that all subsequent counsel were similarly ineffective. This argument fails for the same reason that counsel were not ineffective for failing to present evidence of mental illness as a mitigating factor during the sentencing hearing. Counsel did pursue an investigation into Appellant's mental health, and this investigation did not reveal any mental illness. We cannot therefore find counsel ineffective for not pursuing an avenue of defense, which he did indeed investigate. Furthermore, affidavits presented by Appellant now, rely upon the observations of Robichaus, Brecher, and the representations

of Appellant to determine that Appellant was either under the influence of drugs at the time of the murders, or alternatively suffering from drug withdrawal. Again, there is no reliable evidence which indicates that Appellant was incapacitated at the time of the murders. *See* affidavit of Dr. Henry Dee Appellant's Appendix § 2, *and also* affidavit of Dr. Robert A. Fox, Appellant's Appendix § 3.

■ Appellant argues that trial counsel was ineffective for not effectively impeaching Scott Brecher regarding his drug usage and that all appellate counsel were ineffective for not litigating this issue. Since Brecher was questioned extensively, on direct, cross, redirect, and re-cross examination about his drug usage in general, and immediately following the murders, we can not find that counsel was ineffective for failing to bring this to the attention of the jury. *See* N.T. 10/5/1989 at 24–56. Appellant also asserts that Brecher was using drugs and/or alcohol at the time of his trial testimony. This assertion is also based upon Brecher's affidavit. Brecher affirms that an "investigator gave me some money and I bought a bunch of beers and drank them real fast. That helped to calm me so that I could testify against my friend." Brecher affidavit, Appellant's Appendix § 18, at ¶ 18. Assuming, arguendo, that Brecher's affidavit accurately reflects that he had imbibed alcohol prior to testifying at trial, Appellant fails to explain why or how counsel was or should have been aware of this at the time Brecher testified. It is not apparent from the record that Brecher was intoxicated. Further, even if Brecher had consumed alcohol prior to testifying, again, there is nothing in his affidavit which exonerates Appellant or contradicts his trial testimony or previous statements made to the police.

■ Appellant argues that appellate counsel was ineffective for failing to continue to litigate trial counsel's objections to the admission of photographic evidence. This photograph was a " 'blow-up' of the upper left portion of Shanisha Dunbar's head coming from the bridge of the nose to the top of the skull and from the forehead back as far as the left ear." N.T.

10/4/1989 at 87. Appellant argues that this photograph was unfairly prejudicial and unnecessary because it was redundant of descriptive testimony of the medical examiner and a police detective.

The photograph was not redundant of the medical examiner's testimony, but was offered to illustrate that testimony. The testimony and photograph illustrated that Appellant repeatedly and forcibly hit the victim's head with a hammer, thus demonstrating a basis from which the jury could infer an intent to kill.

■■■ Appellant next argues that trial counsel's summation at the conclusion of the guilt phase was inappropriate, ineffective, or legally incorrect. Trial counsel argued to the jury that it should not find that Appellant committed the murders with premeditation. The closing statement that Appellant now objects to is as follows:

Now, murder of the first degree in an intentional killing. And the Crimes Code defines intentional killing as a killing by means of poison, lying in wait, or any other kind of willful deliberate and premeditated killing. The key terms in terms of intentional killing are premeditation and deliberation. In terms of the time factor. And scholars even today debate over what is the proper time where you can form the premeditation to kill someone. Now, some believe, and certainly it is within your province to say that a person can form the premeditation to kill someone within a fraction of a second. You certainly have that province as jurors to follow that kind of a view. The other view and the more traditional view is that in terms of premeditation, and when we think about premeditation in general we think about plotting to kill someone or planning to kill someone. That is the traditional view; and I think that kind of view, if you applied that view to this particular case here you will come up with third degree murder.

N.T. 10/10/89 at 22–23. Appellant argues now that trial counsel did not understand the jurisprudence of premeditation and that the argument is expressly contradicted by state law,

the prosecutor's argument in this case, and the trial court's charge to the jury. We disagree. Counsel's argument acknowledges that the jury need not find that the murder was premeditated by any certain span of time. However, as the PCRA court wrote, "[trial counsel] simply argues for the interpretation of the law which would be most beneficial to defendant, that there was not enough time in this case to establish premeditation and deliberation." *See* PCRA mem. at 20.

 Appellant asserts that the prosecutor engaged in several instances of prosecutorial misconduct. Specifically, Appellant asserts that the prosecutor expressed a personal opinion of Appellant's guilt. Appellant cites the following paragraphs from the prosecution's closing arguments:

> And first of all let me say that I appreciate your service as jurors and I know you paid close attention to the testimony. But it hasn't been a pleasure, this has been no pleasant case, particularly for me because I knew at the conclusion of the case before the testimony had ended that Ayesha [Appellant's surviving daughter] would testify. It has not been pleasant and I am not happy, will not be happy when you return with the appropriate verdict. That is not the proper emotion to show in a case like this and I won't have it. I will be gratified when justice is done, that is the emotional response I will have if you return with the appropriate verdict of murder in the first degree.

N.T. 10/10/89 at 38–39.

> First I want to say one thing. It never ceases to amaze me how—I am accused of being the director of something that happened two years ago, and another year passes before I even heard the name Jerry Marshall or heard of his wife and stepdaughter or persons who talked to the police within an hour of learning of the death of these deceased and are now being accused of orchestrating a march to anywhere. But [defense counsel] has different obligation that [sic] I have. I have an obligation to present to you testimony and

you have an obligation to render a true and accurate verdict and one that the law requires.

N.T. 10/10/89 at 40.

But I have concluded my remarks, just about and I thank you for bearing with me to this point. Some of the tings I had to say are rather dry. When I discuss some definitions of crimes and things like that I have to do, that is my obligation to point those things out to you. Just like it is my obligation to put on testimony of effort after effort after effort after effort of detectives to find the Defendant unsuccessfully. You will forgive me for that and the length of my speaking out, but you know that when I sit down there and when I take my seat, when I stop speaking there will be no more words, however, on this earth on behalf of justice, Shanisha Dunbar and Donna Marshall. That's it. I say the last words, so I am reluctant to leave any unspoken that will help you reach the appropriate verdict . . . .

N.T. 10/10/89 at 38–39. We see no indication, in these excerpts or in the closing read in whole, of what Appellant alleges is the prosecutor's impermissible "reliance on the authority of his office to garner a guilty verdict." Appellant's brief at 87.

Appellant also cites the following portions of the prosecutor's argument as an inappropriate statement on a witness's credibility:

And I submit to you that the Commonwealth has presented credible witnesses, witnesses whose credibility had not been seriously challenged in cross examination or in any other fashion in the closing or in any other way.

\* \* \*

Well she writes fast script if she writes a script, or perhaps I was able to write that two years after the event. But that's the testimony of Denise Carrington, and I submit to you that it is credible testimony, as is the testimony of Simone Barnes and Bessie Guyton and all the civilian witnesses.

\* \* \*

When I discuss some definitions of crimes and things that I have to do, that is my obligation, to point those things out to you. Just as it is my obligation to put on testimony of effort after effort of detectives to find this [Appellant] unsuccessfully.

N.T. 10/10/1989 at 43, 56, and 59. Again, we simply do not find that these statements are an improper bolstering of the credibility of the witnesses, rather it is an accurate reminder to the jury that the credibility of the Commonwealth's witnesses had not been impeached.

██ Again, Appellant asserts prosecutorial misconduct in the following passage:

And you can imagine the conversation that took place when he was discovered taking money from his wife's purse. What was said? Well, that is the last you're getting because I'm leaving you.

Because you heard testimony from Simone Barnes and Denise Carrington. And despite what [trial counsel] says about the script, this occurred three hours after her sister's death, Denise Carrington said she was leaving him this week, as soon as she got her check she was out of there. So do you think that may have formed part of the conversation that took place when the [Appellant] was discovered taking money that belonged for food for the children for his children's mouths? We won't know because the words of Donna Marshall are long since gone with her.

N.T. 10/10/1989 at 48–49. Appellant argues that the prosecutor drew the jury's attention to an imagined conversation between Appellant and his wife, and because the prosecutor indicated that the contents of the conversation are unknown, the prosecutor invited the jury to draw an adverse inference regarding Appellant's decision not to testify. We find no connection between the prosecutor's statement and Appellant's right not to testify as the clear emphasis of the statement was that the victim was concerned with money and may have confronted Appellant prior to her murder.

Additionally, Appellant argues that the prosecutor attempted to inflame the jury's passions with the following statement:

And remember what Ayesha said when [Appellant] walked out, he walked in the kitchen and he washed the blood from his hands. And I said it before and I will say it again, if you look closely at [Appellant] you can see that the blood is not gone, it is still on his hands. Because the blood of Shanisha Dunbar doesn't wash off that and the blood of Donna Marshall doesn't wash off that easily. It's still there, and it is for you to say so.

And one last thing. Remember what Scotty Brecher said? Surprised me, I didn't know what he was going to say. I asked him did you check to see if Shanisha and Donna Marshall were dead or just injured? And he said I knew they were dead. Because I looked at them and their eyes were open. So they were still open and they look to you for justice.

* * *

Come back in and say that and do your duty and close the eyes of the dead.

N.T. 10/10/1989 at 61–62. This exact statement was previously examined by this Court in the context of Appellant's argument on direct appeal that trial counsel was ineffective for failing to object to these statements. 633 A.2d at 1106–07. We found

[n]othing improper about the prosecutor's closing arguments. The Comments were not a deliberate attempt to destroy the objectivity of the fact finder, but merely summarized the evidence presented at trial with the oratorical flair allowed during argument. Furthermore, the prosecutor repeatedly told the jury to put its emotions aside and return a verdict based on the evidence and the law. Accordingly, we find that the prosecutor's comments did not have the unavoidable effect of prejudicing the jury or unduly influencing its deliberations, and we, therefore, decline to find counsel ineffective for failing to object to the remarks.

633 A.2d at 1107 (citations omitted). This issue has been previously fully and finally litigated and is thus not cognizable under the PCRA.

■ Appellant argues that the trial court gave a defective instruction regarding reasonable doubt at the conclusion of the guilt phase, and that all previous counsel were ineffective for failing to raise this issue. The instruction given at Appellant's trial was:

A reasonable doubt is a doubt that would cause a reasonably careful and sensible person to restrain before acting upon a matter of importance in his own affairs.

N.T. 10/10/1989 at 67. Appellant argues that the word "restrain" should have been replaced by the word "hesitate," citing to the Pennsylvania Bar Institute's Pennsylvania Standard Jury Instructions: Criminal Section, § 7.01(3)(1979).

Trial courts generally have broad discretion in phrasing its instructions and we review the instruction as a whole. *See Commonwealth v. Hawkins*, 567 Pa. 310, 787 A.2d 292 (2001). However, we have explicitly approved of instructions containing the word "restrain" for nearly five decades. *See Commonwealth v. Donough*, 377 Pa. 46, 103 A.2d 694 (1954); *Commonwealth v. Ragan*, 560 Pa. 106, 743 A.2d 390, 401 (2000); *and Commonwealth v. Hawkins*, 567 Pa. 310, 787 A.2d 292 (2001). Thus, this issue is without merit.

Appellant argues that trial counsel was ineffective in preparing for the penalty phase of his trial, because trial counsel did not have mental health experts examine and diagnose Appellant, nor did trial counsel present mental health experts to present mitigating evidence.

Appellant presented to the PCRA court several affidavits from relatives, acquaintances, and mental health experts which portray Appellant as having had a difficult childhood, adolescence, and young adulthood. Dr. Robert Fox and Dr. Henry Dee evaluated Appellant and wrote that Appellant suffered from Post Traumatic Stress Disorder, brain damage, blackouts, and severe and debilitating headaches.

The trial court's docket reveals the following pre-trial time-line. On June 29, 1988, Appellant's initial defense counsel, Marsha H. Niefield, was authorized to retain a psychiatrist to evaluate Appellant. The defense requested and received extra time for investigation on August 3, 1988. On March 20, 1989, Appellant filed a *pro se* motion to remove defense counsel and appoint new counsel. On April 20, 1989, Appellant appeared in court for the scheduled beginning of his trial, only to inform the court that he had filed a federal lawsuit against his counsel. Counsel Niefield's resulting motion for leave to withdraw as counsel was granted; trial counsel was appointed.

Jury selection was conducted between September 26, 1989, and September 28, 1989. On October 2, 1989, Appellant filed a motion "to have a Neurologist and Psychiatrist give the Accused a Complete Psychiatric Evaluation to include a Neuropsychological Test, A[n] Electro-encephalogram Examination and a Examination to Determine Whether the Accused has an Organic Brain Disease." Docket 10–2–1998. At that time, the court discussed the timeliness of the request with trial counsel and the Commonwealth. See N.T. 10/2/1989 at 115–32. In order to avoid delaying the trial indefinitely, the court ordered a psychiatric and EEG test to be performed forthwith, to determine whether further testing was necessary. *See* Docket 10/2/1998; N.T. 10/2/1998 at 116–29. These examinations were completed on October 3, 1989. A report signed by licensed psychologist, Jules DeCruz, M.S., summarized that

> [Appellant] is a cooperative man who demonstrates average intelligence. He shows adequate memory functioning, social judgment and abstract reasoning abilities. There are indications of some emotional conflicts on projective testing but there are no indications of major mental illness or affective disorder. There are also no indications of significant organic involvement or organic impairment indicated by this testing.

Psychological evaluation report 10/3/1989 at 2. The trial began on October 5, 1989. In addition to this report, trial counsel testified that he had consulted with Dr. Allan Tepper, an

attorney and psychologist who had become familiar with the case while Appellant was represented by counselor Niefield.

Trial counsel testified that

[Dr. Tepper] said given the facts in this case, the fact that [Appellant] had strangled his wife with a cord and beaten his daughter with a hammer and then left and came back, gotten the television out and got some clothes, left and came back, he said that it would be very difficult to negate the volitional aspect of the case.

* * *

Bottom line: Dr. Tepper said he really couldn't help me and that I would be better off making the argument [regarding diminished capacity defense] without expert testimony.

N.T. 6/19/1990, at 8. As trial counsel did in fact investigate Appellant's mental health history and Appellant was evaluated by a mental health professional, we cannot find trial counsel ineffective for failing to do so. Further, since that investigation did not uncover any mental illness, we cannot fault counsel for not presenting the product of that investigation as evidence at trial in either the guilt or the penalty phase.

Appellant also argues that the trial court's appointment of psychological testing was improper, this time asserting that it was done *sua sponte* and without the consent, advice or assistance of counsel. As previously discussed, the record does not support this representation of the facts and as such this issue has no merit.

Appellant argues that the trial court erred in its sentencing instructions, that trial counsel erred in failing to object to those instructions, and that all previous appellate counsel were ineffective for failing to raise this claim. Appellant's specific argument is that the jury found Appellant guilty of two counts of first degree murder, but were then told to vote for a single sentence. Appellant points to the "Penalty Determination Sheet", the court's instructions, and the subsequent polling of the jury as evidence that the jury considered both first-degree convictions together instead of coming to two independent sentences. After reviewing the above evidence, we agree that

this issue has merit. However, in the specific facts of this case, we cannot conclude that Appellant was prejudiced. Appellant asserts that the jury may have been split in a manner that it would have lacked the required unanimity to impose the death penalty on either individual count of murder.

We initially note that no member of the jury found any mitigating circumstance. The jury found two aggravating circumstances: the defendant had a significant history of felony convictions involving the use or threat of violence to the person and the defendant had been convicted of another murder either before or at the time of the offense at issue. *See* N.T. 10/11/1989 at 63; 42 Pa.C.S. § 9711(d)(9) and (11). The Commonwealth presented evidence that Appellant had previously been convicted of aggravated robbery, rape, and burglary in support of aggravating circumstance (d)(9). During the guilt phase of the trial, the Commonwealth demonstrated that Appellant committed two murders either at the same time, or one before the other and thus had demonstrated aggravating circumstance (d)(11). With these two aggravating factors, we cannot find that the jury could have, for instance, decided that appellant had previously been convicted of violent crimes prior to the murder of one victim, but not prior to the murder of the other victim. Nor do we find that a more explicit separation of the two sentences would have resulted in any juror finding a mitigating circumstance. As there were no mitigating circumstances found, the jury did not need to weigh, qualitatively, mitigating and aggravating circumstances.

Appellant argues that the trial court's instructions to the jury violated the mandate of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). Where there is a high risk that instructions could be understood as requiring unanimity as to the mitigating circumstances, *Mills* compels that the sentence be vacated. *See Commonwealth v. Holland*, 556 Pa. 175, 727 A.2d 563 (1999). On direct appeal, this issue was raised we explained:

[A]ppellant argues that the trial court erred in its instruction on mitigating circumstances and that trial counsel was

ineffective for failing to object to the same. During the penalty phase of the trial, the trial court instructed the jury as follows;

> The Sentencing Code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.

Appellant argues that this instruction improperly instructed the jury that it could not consider any of the mitigating circumstances unless it unanimously found them to exist. We disagree. The instruction given by the trial judge followed the death penalty statute and the Sentencing Code. We have previously examined this exact instruction and found it to be constitutional and proper. *Commonwealth v. O'Shea*, 523 Pa. 384, 567 A.2d 1023, *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 180, (1990) and *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700, *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). Accordingly trial counsel will not be deemed to be ineffective for failing to object.

633 A.2d at 1111. This issue has been fully and finally litigated and is not cognizable under the PCRA. Appellant however invites us to revisit the issue because the United States Court of Appeals for the Third Circuit has found the instruction given in *Commonwealth v. Frey* to be unconstitutional and granted relief in the form of *habeas corpus. Frey v. Fulcomer*, 132 F.3d 916 (3rd Circuit 1997). We decline to analyze these instructions under the interpretation of Pennsylvania law and the test for the constitutionality of a jury charge in this Commonwealth described by the intermediate federal appeals court.

 Appellant argues that the Commonwealth improperly induced victim impact evidence at the sentencing proceeding. Appellant testified during the sentencing proceeding, and he testified that "One day I would like to see my kids again that I

miss in jail . . ." N.T. 10/11/1989 at 15–16. On cross-examination, the following exchange occurred:

Q. You say you want to see your children again.

A. Yes, I miss my family.

Q Do you think they want to see you?

A. Right now I am sure they don't.

\* \* \*

Q. You know your children can't sleep with the lights off, do you know that because they think you are going to come back and get them and kill them?

[Trial Counsel]: Objection.

The Court: Sustained.

Disregard it.

Please, no comments at this time, just ask questions.

N.T. 10/11/1989 at 19. While Appellant notes that the objection to the last question above was sustained and the jury instructed to disregard it, he does not explain why this is an insufficient cure for the inappropriate question.

▮▮▮▮ In an independent motion to this Court, as well as in his brief, Appellant argues that his case be remanded to the PCRA court for newly discovered evidence of racial discrimination in the publication of *Racial Discrimination and the Death Penalty in the Post–Furman Era: An Empirical and Legal Overview, with Recent Findings from Philadelphia*, David Baldus, George Woodworth, *et al.*, 83 Cornell L. Review 1638 (1998). Appellant has failed to provide any link between the findings of this statistical abstract and his particular case. Similarly Appellant seeks a remand for review of a video tape produced by former Assistant District Attorney Jack McMahon which purports to train prosecutors to discriminate against African–American jurors. This Court has reviewed Appellant's claim under *Batson v. Kentucky,* and found that Appellant has failed to demonstrate any racial bias in the jury selection process. A remand to the PCRA court for consideration of these issues would be futile, as neither piece of "evidence" has any grounding in the particular facts of Appel-

lant's case. The application for permission to file supplemental pleading and motion to remand to the PCRA court on the basis of new evidence is denied.

Appellant also argues that the trial court erred in refusing to conduct an evidentiary hearing on his claims of ineffective assistance of counsel. The Rules of Criminal Procedure, in effect in 1997, allowed a PCRA court to make a disposition without a hearing where:

> The judge shall promptly review the [PCRA] motion, any answer by the attorney for the Commonwealth, and other matters of record relating to the defendant's claim(s). If the judge is satisfied from this review that there are no genuine issues concerning any material fact and that the defendant is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings, the judge shall give notice to the parties of the intention to dismiss the motion and shall state in the notice the reasons for dismissal.

Former Pa.R.Crim.P. 1507(a)(renumbered with some differences in language at Pa.R.Crim.P. 908). The relevant question with regards to the issue is whether a material question of fact was presented. Appellant submitted to the PCRA court, as well as to this Court, a significant amount of factual material primarily in the form of affidavits from various potential witnesses including mental health witnesses, family, and friends. The veracity of these affidavits are not in dispute here, however, for the various reasons stated previously in this opinion this evidence does not entitle Appellant relief under the PCRA. Additionally, many of the issues which often require a hearing were resolved under the unique post-trial procedure which included testimony from Appellant as well as trial counsel. For the reasons stated above, Appellant has not demonstrated his eligibility for relief under the PCRA and we affirm the order of the Philadelphia County Court of Common Pleas.[4]

Justice CAPPY files a concurring opinion.

4. The prothonotary is directed to transmit a full and complete record of these proceedings to the Governor pursuant to 42 Pa.C.S. § 9711(i).

Justice NIGRO concurs in the result.

Justice CASTILLE files a concurring and dissenting opinion in which Justice EAKIN joins.

Justice SAYLOR files a dissenting opinion in which Justice NEWMAN joins.

Justice CAPPY, concurring.

I cannot join the majority opinion to the extent that it reviews Appellant's arguments as claims of trial court error. Appellant presents some of his claims in terms of trial court error and the majority opinion addresses those claims in kind. I cannot join the merits analysis as to those claims, since Appellant failed to comply with the *Pierce*[1] standard of ineffectiveness and thus, such claims are waived. *See, e.g., Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693 (1998)(eliminating relaxed waiver in capital cases for purposes of collateral review).

In all other respects, I join the majority opinion.

Justice CASTILLE, concurring and dissenting.

I agree with the lead opinion that: (1) this PCRA petition must be deemed to be appellant's first PCRA petition (a point the Commonwealth does not dispute); (2) those of appellant's claims which were previously litigated are not cognizable under the PCRA; and (3) appellant is not entitled to PCRA relief. However, I respectfully disagree with the lead's approach to several of appellant's claims which have not been previously litigated but which the lead opinion reviews on the merits since these claims are indisputably waived under the PCRA. By reviewing those claims, the lead opinion ignores the PCRA waiver provision, and thereby resurrects the discretionary relaxed waiver doctrine that this Court abrogated on PCRA review in *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 700 (1998). Furthermore, in light of this Court's recent, inconsistent treatment of waived claims under the PCRA, I find myself in sufficient disagreement with the lead

1. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

opinion's relaxed waiver approach as to warrant a dissenting posture.

My concern with the Court's approach to claims which are waived under the terms of the PCRA is not confined to this case. In its treatment of appellant's waived claims, the lead opinion here merely continues a hushed but steady erosion of *Albrecht,* and a return to PCRA relaxed waiver, which is also reflected in this Court's majority decisions in *Commonwealth v. Marrero,* 561 Pa. 100, 748 A.2d 202 (2000), *Commonwealth v. Williams,* 566 Pa. 553, 782 A.2d 517 (2001), and *Commonwealth v. Meadows,* 567 Pa. 344, 787 A.2d 312 (2001). Notwithstanding repeated statements by clear majorities of the Court that *Albrecht* is sound decisional law, *see, e.g., Commonwealth v. Bracey,* 568 Pa. 264, 795 A.2d 935, 940–41 (2001); *Commonwealth v. Hawkins,* 567 Pa. 310, 787 A.2d 292, 296 (2001), as well as the Court's unanimous holdings that application of *Albrecht,* and fidelity to the PCRA waiver provision, is not unlawfully retroactive, *e.g., Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717, 725–26 (2000); *Commonwealth v. Pursell,* 555 Pa. 233, 724 A.2d 293, 302 (1999), the Court, in practice, is still reluctant to abandon pre-*Albrecht* practice and actually enforce the PCRA's unequivocal and duly-enacted waiver provision. Accordingly, shifting and unpredictable majorities of the Court have continued to reach select waived claims—albeit usually without ever acknowledging the fact of waiver—and have thereby reinstituted a form of relaxed waiver practice on PCRA review. The result is the most dire circumstance that can characterize a high Court's appellate jurisprudence: an inconsistent approach to similarly-situated litigants. Indeed, cases decided on the very same day, December 31, 2001, and in the same posture respecting PCRA waiver, were accorded fundamentally different treatment by this Court on the question of how to approach waived claims. *See, e.g., Bracey; Meadows; Commonwealth v. Lambert,* 568 Pa. 346, 797 A.2d 232 (2001) (Opinion Announcing Judgment of Court); *Commonwealth v. Gorby,* 567 Pa. 370, 787 A.2d 367 (2001) (Opinion Announcing Judgment of Court). Also, additional approaches to waived claims were employed in opinions

decided shortly before that day. *See Commonwealth v. Rivers*, 567 Pa. 239, 786 A.2d 923 (2001) (Opinion Announcing Judgment of Court); *Commonwealth v. (Michael) Pierce*, 567 Pa. 186, 786 A.2d 203 (2001); *Williams*. In one instance, a majority of the Court essentially ignored the holding in *Albrecht* and granted relief in the form of a remand for a second ineffectiveness hearing upon a claim of ineffective assistance of trial counsel that was obviously waived under the PCRA, since the appellant had been represented by new counsel on direct appeal and, thus, had a previous opportunity to raise the claim. *Gorby.*[1] *See id.*, 787 A.2d at 373–74 (Castille, J., concurring and dissenting).[2] Most recently, the Court's struggles with *Albrecht* led it to refuse to review a waived claim—a position consistent with *Albrecht* but squarely inconsistent with today's lead opinion—but then to relax the substantive constitutional standard applicable to the non-waived version of that claim, in order to justify the summary grant of relief in a case where the non-waived claim (sounding in appellate counsel ineffectiveness) was raised in boilerplate fashion. *See Commonwealth v. Ford*, 809 A.2d 325 (Pa.2002) (Opinion Announcing Judgment of Court), 2002 WL 31398623 (Pa. Oct. 25, 2002).

I strongly believe that the course followed today, which would effectively overrule *Albrecht* and reinstitute full-blown relaxed waiver on PCRA review, is erroneous. On the question of relaxed waiver, *Albrecht* was absolutely correct; the decision merely enforced the unequivocal terms of the PCRA and discontinued an inadvertent judicial negation of those statutory terms by use of the discretionary relaxed waiver

1. The portion of former Chief Justice Flaherty's lead opinion which remanded on the claim of trial counsel ineffectiveness was joined only by Mr. Justice Cappy and Mr. Justice Saylor. Now–Chief Justice Zappala, Mr. Justice Nigro and Madame Justice Newman all concurred in that result without explanation.

2. The fact that *Gorby*, like so many recent decisions in the capital PCRA arena, resulted in a non-precedential lead opinion aggravates, rather than mitigates, the situation. In *Gorby*, a majority of the Court agreed to reach and remand upon an obviously waived claim without even attempting to square the decision with *Albrecht*. But this Court's practice of ignoring the cases with which a decision is obviously inconsistent does not make the inconsistency disappear.

doctrine. *See Bracey*, 795 A.2d at 951–57 (Castille, J., concurring). I do not believe this Court has the power to refuse to apply duly-enacted legislation—at least not unless there is some constitutional basis for doing so. But, if the Court is truly determined to return to the days of judicial negation of the PCRA's waiver provision—this time deliberately—it would be better that we do so forthrightly and overrule *Albrecht.*

I suspect, however, that the unspoken concern that animates the Court's fitful and unacknowledged returns to relaxed waiver has less to do with what *Albrecht* said about relaxed waiver generally and more to do with an understandable discomfort with the necessary and unavoidable consequences of applying the PCRA waiver provision to petitions that were litigated in the lower courts before *Albrecht* was decided. The breadth and depth of these concerns may not have been fully foreseeable at the time we decided *Albrecht* or even at the time of our initial decisions on *Albrecht* retroactivity. *See, e.g., Williams*, 782 A.2d at 524–25 (discussing task for PCRA counsel in light of recent PCRA legislation and judicial decisions, including *Albrecht's* enforcement of PCRA waiver provision). *See also Ford*, 809 A.2d at 337 (Saylor, J. concurring), (Eakin, J. dissenting), at 347–48. If that is the case, *i.e.*, if the Court simply finds itself unwilling in practice to apply the PCRA waiver provision to cases where the PCRA petition was dismissed before *Albrecht* was decided, then the Court should face the problem squarely, overrule the unanimous decisions in *Pursell* and *Basemore* on the question of *Albrecht* retroactivity, and adopt a cogent and consistent position on this narrow class of cases.

I make this suggestion even though I continue to believe that we have decided the question of *Albrecht* retroactivity correctly, given the true discretionary scope of the relaxed waiver doctrine, and given the fact that this Court cannot simply ignore that the PCRA deems waived claims unreviewable. *See Bracey*, 795 A.2d at 951–57 (Castille, J., concurring); *accord Ford*, 809 A.2d at 345 & n. 8 (Castille, J., dissenting). I continue to believe that we should enforce—indeed, we should deem ourselves required to enforce—the PCRA waiver provi-

sion. But if the Court is set on another course in this narrow class of cases involving PCRA petitions decided before *Albrecht,* I would prefer that it announce that course openly and apply the new doctrine evenly—rather than giving the impression that Albrecht; *Pursell,* and *Basemore* are good law, while ignoring what those decisions command. Such a course, unlike the present one, at least would have the virtue of being knowable and even-handed.

My specific disagreement with the lead opinion's approach in this particular case is identical to the concern that led me to write separately in *Meadows:* The lead opinion reviews, on the merits, claims that are indisputably waived under the PCRA and, in so doing, fails to comment on those claims that actually are cognizable under the PCRA. More specifically, an issue is waived under the PCRA "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." *Id.* § 9544(b). Appellant here was represented by new counsel on post-trial motions, and again on direct appeal to this Court. Appellant was thus provided a full opportunity to litigate claims of alleged trial court error and trial counsel ineffectiveness on his direct appeal to this Court. Appellant seized that opportunity on direct appeal, raising claims sounding both in trial court error and in ineffective assistance of trial counsel. *See Commonwealth v. Marshall,* 534 Pa. 488, 633 A.2d 1100 (1993). As the Commonwealth here correctly argues, appellant's substantive claims, which are framed and developed as claims sounding in trial court error or trial counsel's alleged ineffectiveness, are waived under the PCRA.

Despite the fact that all of appellant's claims sounding in trial court error or trial counsel ineffectiveness are waived under the PCRA, the lead opinion reviews the waived claims on the merits. Although the lead opinion never invokes the term "relaxed waiver," it obviously can reach the claims only by ignoring, or "relaxing," the PCRA's waiver provision. I do not believe we have this power. Consistently with the actual, plain language of the governing legislation, *Albrecht* and its progeny, and our decisions on *Albrecht* retroactivity, I dissent

from this unacknowledged resurrection of the relaxed waiver doctrine on PCRA review.

I recognize that the lead opinion's silent relaxed waiver approach here is consistent with the approach taken in *Meadows,* which was a majority decision of this Court, as well as the cases pre-dating *Albrecht.* But it is decidedly inconsistent with the very terms of the PCRA, with the majority decision in *Albrecht* abrogating relaxed waiver, with our majority decisions on *Albrecht* retroactivity (*Pursell; Basemore; Bracey*), and with other majority decisions of this Court. *See Bracey; Commonwealth v. Abdul–Salaam,* 808 A.2d 558, 2001 WL 34041795 (2002); *(Michael) Pierce; Williams.* Until this Court settles on a clear and comprehensible view of the question of applying the PCRA waiver provision to cases that were pending when *Albrecht* was decided, which it is willing to enforce, or until it overrules the competing lines of majority decisions that conflict with today's decision, I am compelled to respectfully voice my dissent. In short, so long as *Albrecht; Pursell,* and *Basemore* are deemed to be sound law, as I believe they are, it is my position that we should enforce those decisions, which merely vindicate the actual, plain language of the PCRA. Such is my position even though I recognize that there are now competing lines of authority that squarely undermine *Albrecht; Pursell,* and *Basemore,* in cases involving petitions that were pending when *Albrecht* was decided.

Here, as in *Meadows,* the only non-waived claims available to appellant on PCRA review are those that would sound in the ineffective assistance of his direct appeal counsel. In his initial brief and his supplemental brief, appellant forwards only boilerplate assertions of appellate counsel ineffectiveness. As I have noted at length in other cases, *see, e.g., Ford,* 809 A.2d at 344–45 (Castille, J., dissenting), *Commonwealth v. Moore,* 805 A.2d 1212, 1229–31 (Pa.2002) (Castille, J., joined by Newman and Eakin, JJ., concurring and dissenting); *Meadows,* 787 A.2d at 324–26 (Castille, J., concurring), since the test for counsel ineffectiveness is not a *per se* one, such a boilerplate argument fails to prove an entitlement to relief under the test for ineffectiveness established in *Strickland v. Wash-*

*ington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and its progeny, including *Smith v. Robbins,* 528 U.S. 259, 285–89, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) and *Commonwealth v. (Charles) Pierce,* 515 Pa.153, 527 A.2d 973 (1987), and in the PCRA itself. *See* 42 Pa.C.S. § 9543(a)(4) (petitioner must plead and prove, *inter alia,* "[t]hat the failure to litigate the issue prior to or during trial . . . or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel"). Because appellant's claims sounding in trial court error and ineffectiveness of trial counsel are waived under the PCRA, and because appellant has failed to sustain his burden of rebutting the presumption that his appellate counsel was effective, I concur in the mandate, but only in the mandate, affirming the denial of PCRA relief.

Justice EAKIN joins this concurring and dissenting opinion.

Justice SAYLOR, dissenting.

I find the allegations and affidavits of the amended petition sufficient to implicate an evidentiary hearing pursuant to *Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167 (1999). Since no such post-conviction hearing was afforded, I respectfully dissent.

Justice NEWMAN joins this dissenting opinion.