

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-22-2004

# Holloway v. Horn

Precedential or Non-Precedential: Precedential

Docket No. 01-9009

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Holloway v. Horn" (2004). *2004 Decisions.* Paper 1044.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1044

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed January 22, 2004

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 01-9009/9010

———————

ARNOLD HOLLOWAY,
                    *Appellant, No. 01-9009*

v.

MARTIN HORN, SECRETARY, DOC; DONALD VAUGHN,
SUPERINTENDENT, SCI-GRATERFORD; THE DISTRICT
ATTORNEY OF THE COUNTY OF PHILADELPHIA; THE
ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA,
                    *Appellants, No. 01-9010*

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 00-cv-01757)
District Judge: Hon. Franklin S. VanAntwerpen

———————

Argued October 27, 2003

Before: SLOVITER, MCKEE and COWEN, *Circuit Judges*

(Filed: January 22, 2004)

———————

Matthew C. Lawry, Esq.
Billy H. Nolas, Esq.
David W. Wycoff, Esq. (Argued)
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106

Counsel for Appellant/Cross
Appellee

Thomas W. Dolgenos, Esq. (Argued)
Office of District Attorney
1421 Arch Street
Philadelphia, PA 19102

Counsel for Appellees/Cross
Appellants

## OPINION OF THE COURT

COWEN, *Circuit Judge*.

A Philadelphia jury convicted Arnold Holloway of first-degree murder for the brutal slaying of Richard Caldwell and imposed a sentence of death. Holloway raises several claims of constitutional error in this federal habeas corpus proceeding. We need only reach his contention that the Commonwealth of Pennsylvania used its peremptory strikes to exclude African-Americans from the petit jury in violation of the Equal Protection Clause and *Batson v. Kentucky*, 476 U.S. 79 (1986). The District Court held that Holloway procedurally defaulted his *Batson* claim by failing to raise it on direct appeal in state court, and alternatively held that the claim was without merit. We conclude that Holloway exhausted his *Batson* claim both on direct appeal and in state post-conviction proceedings, and committed no procedural default to bar review in federal court. On the merits, the use by the Commonwealth of eleven of its twelve peremptory strikes to exclude African-Americans from the jury, together with the failure to offer race-neutral reasons for the strikes, particularly of venireperson John Hackley,

Sr., violated the principles of *Batson*. Accordingly, we will reverse the District Court's judgment and remand for issuance of the writ conditioned upon the Commonwealth's right to conduct a retrial.

## I.  Background & Procedural History

In the early morning hours of May 16, 1980, Philadelphia police found the body of seventeen-year-old Richard Caldwell on a secluded North Philadelphia street corner, dead from strangulation and two shotgun wounds to the head. The murder remained unsolved until January 1985, when the police arrested a neighborhood heroin dealer, Shirley Baker, who was wanted for sentencing on several drug-related convictions and had become a suspect in the murder. While in custody, Baker told the police that her fellow dealers, Holloway and Danny Freeman, had murdered Caldwell.

According to Baker, Holloway was a middleman who supplied heroin to Baker, Freeman, and Caldwell for street-level distribution. Holloway, in turn, answered to an individual named Leroy Johnson. Johnson came to believe that Caldwell was "messing up the money" and otherwise interfering with his business plans, and he instructed Holloway to kill Caldwell. Baker claimed that she was in her apartment with Johnson ingesting cocaine around midnight on May 16, when Freeman and Holloway arrived and asked to use Johnson's van. Johnson informed Holloway that Caldwell was in the van, and Holloway replied, "I can take care of that now." Holloway and Freeman retrieved a shotgun from Holloway's upstairs apartment and departed in the van. They returned around thirty minutes later, at which point Holloway whispered with Johnson about having tied up and strangled Caldwell. Holloway, Johnson, and Freeman then left Baker's apartment, with Johnson asking Holloway if he had cleaned up the van.

In May 1985, Philadelphia police located Holloway and took him into custody. According to the Commonwealth's trial evidence, Holloway confessed to the murder while in custody by providing a typewritten statement to Detective

Ernest Gilbert, which he refused to sign. Holloway's statement was largely consistent with Baker's account of the murder. Holloway added, however, that he murdered Caldwell because of a threat to his own life from Johnson. He admitted that he and Freeman tied Caldwell's hands together, drove the van several blocks from the apartment, and pushed Caldwell into the street. They strangled Caldwell by taking turns pulling at a belt around his neck, and then shot him twice in the head at close range.

The Commonwealth charged Holloway in the Philadelphia County Court of Common Pleas with first-degree murder, criminal conspiracy, and possession of an instrument of crime. Pretrial litigation arose primarily from the fact that, days prior to Holloway's arrest, a jury had acquitted his alleged accomplice Danny Freeman on charges of murdering Caldwell. Holloway moved to suppress his custodial statement, claiming, *inter alia*, that he never made it and would not have done so because he knew at the time of his arrest that Freeman had been acquitted. The trial court denied the suppression motion. The trial court also granted a Commonwealth motion to preclude discussion before the jury of Freeman's acquittal. That ruling barred Holloway from arguing that his custodial statement should be disbelieved because he and Detective Gilbert both knew of Freeman's acquittal at the time the statement was purportedly made.

The voir dire examination of prospective jurors, discussed in greater detail below, was conducted over the course of three days. The Commonwealth exercised a total of twelve peremptory challenges, eleven of which were used to strike African-Americans. Holloway, an African-American, raised objections, created a record as to the race of the stricken venirepersons, and moved for a mistrial on the ground that a pattern of purposeful discrimination had been established. The prosecutor responded by explaining his reasons for three of the strikes, but the trial court rendered no express or otherwise articulated ruling on Holloway's objections; instead, it implicitly rejected the *Batson* challenge by letting the matter proceed to trial.

At trial the Commonwealth relied primarily upon the testimony of Shirley Baker and Detective Gilbert. Holloway

testified in his own defense, claiming that Detective Gilbert fabricated his custodial statement. Holloway's wife, Delores Kareem, bolstered this assertion by testifying regarding a phone call she received from Holloway shortly after he made the purported statement. Holloway also called as a witness the victim's adopted brother, Alfonso Walker, who testified that other drug dealers were angry with and had assaulted Caldwell shortly before his death. Finally, Holloway presented an alibi defense, seeking to establish that he was intoxicated and at the home of Carmella Davis the night of the murder, in support of which he presented the testimony of Davis and her then-boyfriend.

The jury convicted Holloway on all counts after a three-day trial. A capital sentencing proceeding was conducted immediately following the verdict. The Commonwealth rested on its trial evidence at sentencing, while Holloway presented his wife as the sole sentencing witness. The jury found the two aggravating circumstances asserted by the Commonwealth: (1) Holloway paid or was paid by another person, had contracted to pay or be paid by another person, or had conspired to pay or be paid by another person for the killing, 42 Pa. Cons. Stat. § 9711(d)(2); and (2) the killing was effectuated by means of torture, *id.* at § 9711(d)(8). The jury also found the two mitigating circumstances upon which it was charged: (1) Holloway had no significant history of prior convictions (to which the Commonwealth had stipulated), *id.* at § 9711(e)(1); and (2) evidence pertaining to Holloway's character, *id.* at § 9711(e)(8). It concluded that the two aggravating circumstances outweighed the two mitigating circumstances and imposed a death sentence for the murder conviction. The court also sentenced Holloway to consecutive terms of five to ten years for conspiracy to commit murder, and two and one-half to five years for possessing an instrument of crime.

Holloway pursued a direct appeal as of right to the Pennsylvania Supreme Court, which affirmed the convictions and sentences. *Commonwealth v. Holloway*, 572 A.2d 687 (Pa. 1990) ("*Holloway I*"). In 1991, Holloway filed a petition for state-court collateral review under the Pennsylvania Post-Conviction Relief Act, 42 Pa. Cons. Stat.

§§ 9541-9546 ("PCRA"). The trial court denied the petition after an evidentiary hearing, and the Pennsylvania Supreme Court affirmed. *Commonwealth v. Holloway*, 739 A.2d 1039 (1999) ("*Holloway II*").

On April 4, 2000, Holloway timely filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Pennsylvania, raising sixteen grounds for relief. The District Court conducted a limited evidentiary hearing regarding the purported procedural default of Holloway's *Batson* claim, and thereafter issued an opinion denying relief on all trial-phase claims. *Holloway v. Horn*, 161 F. Supp. 2d 452 (E.D. Pa. 2001) ("*Holloway III*"). The District Court held in pertinent part that the *Batson* claim was procedurally defaulted and, in any event, was without merit. As to the sentencing phase, the District Court concluded that Holloway's counsel provided ineffective assistance in failing to investigate mental-health issues and request the assistance of a mental-health expert. The District Court thus issued the writ conditioned upon the Commonwealth's right to conduct a new sentencing proceeding. Holloway timely appealed (C.A. No. 01-9009), and the Commonwealth timely cross-appealed (C.A. No. 01-9010).

## II. Jurisdiction & Standard of Review

We granted Holloway a certificate of appealability to raise six issues on appeal, including whether the Commonwealth used its peremptory strikes in violation of *Batson*.[1] Given

---

1. The other five issues are as follows: (1) whether the trial court improperly excluded evidence that Holloway and Detective Gilbert were aware of Danny Freeman's acquittal, offered for the limited purpose of showing Holloway's state of mind and the motivation of Detective Gilbert at the time of the supposed confession; (2) whether the prosecutor's guilt phase argument was egregiously improper and violated due process; (3) whether Holloway's conviction of the crime of conspiracy, which was barred by the statute of limitations, violated due process and the ex post facto clause; whether the trial court's instructions on accomplice liability violated due process; and together, whether these violations prejudicially affected the jury's deliberations on the charge of first-degree murder; (4) whether the jury instructions unconstitutionally indicated that the jury had to unanimously find any mitigating circumstances before giving it effect in its sentencing decision; and (5) whether the District Court erred in holding these claims procedurally defaulted.

our disposition of the *Batson* issue, we need not address Holloway's remaining claims. Nor do we reach the Commonwealth's challenge on cross-appeal to the District Court's issuance of the writ based on its finding that counsel provided ineffective assistance at sentencing.

We have appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a). We conduct a plenary review of the District Court's legal conclusions and review its factual conclusions for clear error. *Whitney v. Horn*, 280 F.3d 240, 249 (3d Cir. 2002). Our review is also plenary as to the District Court's determinations regarding exhaustion and procedural default. *Id.*; *Hull v. Kyler*, 190 F.3d 88, 97 (3d Cir. 1999).

### **III.** The *Batson* Claim

1. Procedural Default

In *Holloway II*, the Pennsylvania Supreme Court held that Holloway's *Batson* claim was procedurally defaulted, because it had not been raised before the PCRA trial court. In *Holloway III*, the District Court agreed with the Pennsylvania Supreme Court that the *Batson* claim had been defaulted. As discussed below, we find no procedural default.

In its reading of the record, the District Court concluded that Holloway committed a procedural default because it believed that the Pennsylvania Supreme Court refused on the PCRA appeal to reach the merits of the *Batson* claim due to a waiver caused by counsel's failure to raise the *Batson* claim on direct appeal. The record is clear, however, that the Pennsylvania Supreme Court did not fault Holloway for counsel's failure to raise the *Batson* claim on direct appeal. Rather, the Court believed (mistakenly) that Holloway had not raised his *Batson* claim at the PCRA trial level, and held that, for that reason alone, the *Batson* argument was waived from appellate review on the merits. See *Holloway II*, 739 A.2d at 1044. Relying upon its decision in *Commonwealth v. Albrecht*, 720 A.2d 693 (Pa. 1998) which held that a PCRA petitioner's waiver at the trial level would only be excused upon a demonstration of ineffectiveness of counsel in waiving the issue, the Court

addressed Holloway's *Batson* claim solely as an assertion of counsel's ineffectiveness in waiving the claim. *Holloway II*, 739 A.2d at 1044-46.

Given this record, the District Court erred in concluding that Holloway committed a procedural default due to counsel's failure to raise the *Batson* claim on direct appeal. The Pennsylvania Supreme Court never expressly or otherwise held the claim defaulted for that reason in *Holloway II*. A federal habeas court is "not bound to enforce a state procedural rule when the state itself has not done so, even if the procedural rule is theoretically applicable to [the] facts." *Smith v. Freeman*, 892 F.2d 331, 337 (3d Cir. 1989); *see also Harris v. Reed*, 489 U.S. 255, 263 (1989) ("[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.") (citations and quotation marks omitted). For these reasons, we hold that the *Batson* claim was not defaulted.

2. Exhaustion

We must next determine whether Holloway exhausted state-court remedies on his *Batson* claim, which Holloway claims to have done on direct appeal. The District Court rejected that contention and the Commonwealth urges affirmance on that ground. The Commonwealth argues that the exhaustion requirement was not met because Holloway raised the *Batson* argument to the Pennsylvania Supreme Court on direct appeal solely in a pro se supplemental brief, and not in his counseled appellate brief. We conclude that Holloway satisfied the exhaustion requirement on direct appeal.

A federal court will not grant a state prisoner's petition for a writ of habeas corpus unless available state-court remedies on the federal constitutional claim have been exhausted. 28 U.S.C. § 2254(b)(1); *Stevens v. Del. Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002). The exhaustion requirement is satisfied only if the petitioner can show that he fairly presented the federal claim at each level of the established state-court system for review. *O'Sullivan v.*

*Boerckel*, 526 U.S. 838, 844-45 (1999); *Whitney*, 280 F.3d at 250.[2] "Fair presentation" of a claim means that the petitioner "must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999) (citations omitted).

After the denial of his post-verdict motion for a new trial, Holloway was appointed new counsel for his direct appeal as of right. Counsel did not brief a *Batson* issue to the Pennsylvania Supreme Court, although trial counsel had preserved that issue by moving for a mistrial based on the prosecutor's pattern of striking potential African-American jurors. Holloway himself, however, raised a *Batson* claim in a pro se appellate brief that he filed several months after the counseled brief was filed. He also filed an application for permission to file the pro se brief as a supplement to the counseled brief. Holloway argued the legal and factual substance of a claim of purposeful discrimination, cited the Equal Protection Clause as well as *Batson* and other relevant case law, and claimed that the trial court erred in failing to grant his motion for a mistrial based on the prosecutor's pattern of strikes and the failure to offer race-neutral explanations. App. Vol. III at 442. Holloway objected in particular to the strikes of venirepersons Robert Keel and John Hackley, Sr. (discussed *infra*), and claimed that "the prosecutor used his peremptory challenges to strike African-American people from sitting on the jury." *Id.* at 442-43.

The Pennsylvania Supreme Court entered an order deferring consideration of Holloway's application to file the pro se supplemental brief until the time of oral argument on the appeal. App. Vol. III at 450. In its opinion in *Holloway I*, however, the court made no mention of the pro se brief or the *Batson* claim, and issued no order or

---

2. The established system for review in Pennsylvania capital cases is an appeal from the trial level directly to the Pennsylvania Supreme Court; this system applies both on direct review following conviction and sentencing, *see* 42 Pa. Cons. Stat. §§ 722(4), 9711(h)(1), and in PCRA proceedings, *see id.* at § 9546(d).

decision on whether it had accepted or rejected the pro se brief for consideration.

The District Court held a limited evidentiary hearing to determine whether Holloway could show "cause" to overcome what the District Court perceived to be a procedural default caused by counsel's failure to raise the *Batson* claim on direct appeal.[3] The lone witness at the federal hearing was Holloway's counsel on direct appeal, who testified that although he could recall no discussion on the *Batson* claim at oral argument, the Pennsylvania Supreme Court indicated that it would take all issues presented under advisement, including those presented in the pro se supplemental brief. *See* App. Vol. IV at 625-26 ("[T]he Court said it would consider all the matters contained in the pleadings set forth and the *Batson* issue was one of them."); *id.* at 626 ("[T]he Court even noted the fact that it would consider the *Batson* issue or at least his pro se brief."); *id.* at 642 ("[T]he Court had duly noted that it had received the pro se brief, was taking it under advisement, taking all the matters raised under advisement after oral argument."). The Commonwealth, for its part, presented no evidence at the federal hearing to rebut or cast any doubt upon counsel's recollection that the state court accepted the pro se supplemental brief for consideration. On this record, Holloway has met his burden of showing that he exhausted the *Batson* claim on direct appeal, as he placed the state court on notice of the factual and legal substance of his federal equal protection

_____

3. A federal court may not consider the merits of a procedurally defaulted claim unless the petitioner establishes "cause and prejudice" or a "fundamental miscarriage of justice" to excuse the default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To show "cause," the petitioner "must demonstrate some objective factor external to the defense that prevented compliance with the state's procedural requirements." *Id.* at 753; *see also Cristin v. Brennan*, 281 F.3d 404, 420 (3d Cir.), *cert. denied*, 123 S. Ct. 195 (2002).

However, Holloway committed no procedural default on direct appeal, as discussed below, as he exhausted the *Batson* claim by way of his pro se brief. Thus, even if he violated a state procedural rule in the PCRA proceedings (which he did not), the substance of his *Batson* claim can be reviewed on the merits by virtue of the direct appeal exhaustion.

argument and raised the claim through the established system for review. *Cf. Buehl v. Vaughn*, 166 F.3d 163, 176 n.8 (3d Cir. 1999) (noting in a capital case that counseled petitioner exhausted claims by presenting them in a pro se brief to the Pennsylvania Supreme Court).

The Commonwealth argues that we cannot rely on the testimony of Holloway's direct appeal counsel because the District Court lacked authority under 28 U.S.C. § 2254(e)(2) to hold an evidentiary hearing.[4] Appellees Br. at 55-57. This Court has held, however, that it is within a District Court's authority to grant a hearing on a petitioner's ability to establish cause to excuse a procedural default, and therefore "§ 2254(e)(2) is inapplicable to those hearings." *Cristin v. Brennan*, 281 F.3d 404, 412-13 (3d Cir.), *cert. denied*, 537 U.S. 897, 123 S. Ct. 195 (2002). Appellate counsel's testimony regarding the direct appeal proceedings fell within the scope of the evidentiary hearing, which was conducted to determine whether there was any "objective factor external to the defense" that prevented counsel from pressing the *Batson* claim in the counseled direct appeal brief. Thus, the evidence adduced at the hearing is properly considered for purposes of the exhaustion analysis.

Our conclusion that Holloway exhausted the *Batson* claim by means of his pro se brief is fully supported by the Pennsylvania Supreme Court's practice, at the time of

---

4. Section 2254(e)(2) provides as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Holloway's appeal, of considering issues raised pro se even if counseled briefs were filed. In a capital case decided while Holloway's direct appeal was pending, *Commonwealth v. Billa*, 555 A.2d 835 (Pa. 1989), the Pennsylvania Supreme Court noted that appellate counsel neglected to raise an issue concerning the trial court's failure to render an appropriate jury instruction. The appellant himself, however, raised a challenge on that basis in a pro se supplemental brief. *Id.* at 842. The Pennsylvania Supreme Court granted permission to file the pro se brief as a supplement to the counseled brief and further granted relief on the merits of the claim. *Id.* In several subsequent capital cases, the Pennsylvania Supreme Court again considered the merits of pro se claims raised by a counseled appellant. *See, e.g.*, *Commonwealth v. Williams*, 615 A.2d 716, 720 n.6 (Pa. 1992); *Commonwealth v. Zook*, 615 A.2d 1, 22 (Pa. 1992); *Commonwealth v. Chambers*, 599 A.2d 630, 633 (Pa. 1991); *Commonwealth v. Tilley*, 595 A.2d 575, 579 n.9 (Pa. 1991).

The Pennsylvania Supreme Court first indicated that it might change course with regard to accepting pro se supplemental briefs in *Commonwealth v. Ellis*, 626 A.2d 1137 (Pa.1993). In *Ellis*, a non-capital case, the Court affirmed the intermediate Superior Court's practice of refusing to entertain pro se briefs if the appellant is represented by counsel. The Superior Court had held that it "will accept for filing pro se appellate briefs, but [ ] will not review a pro se brief if a counseled brief has been filed, either before, simultaneously with, or after the pro se, due to the judicial confusion and delay that ensues." *Commonwealth v. Ellis*, 581 A.2d 595, 600 (Pa. Super. Ct. 1990). The Pennsylvania Supreme Court approved this practice. It explained that criminal appellants possess no constitutional right to hybrid representation and, therefore, a refusal to consider pro se briefs from counseled litigants is warranted so as not to "confuse and overburden the court." 626 A.2d at 1140; *see also Commonwealth v. Rogers*, 645 A.2d 223, 224 (Pa. 1994) (explaining that "*Ellis* specifically condemns the practice of filing separate pro se briefs" and holding that an appellant cannot terminate counsel after the filing of a counseled brief "simply because he wishes to file pro se appellate briefs"). The Pennsylvania

Supreme Court then applied the *Ellis* principle in a direct capital appeal, *Commonwealth v. Reid*, 642 A.2d 453 (Pa. 1994), where the appellant filed a pro se supplemental brief raising four claims of error after the counseled brief had been filed. Citing its reasoning in *Ellis*, the Court rejected the supplemental brief, holding that "Appellant's pro se claims are improper and will not be considered by this Court." *Id.* at 462.

*Ellis* and *Reid* marked a retreat from the consideration of pro se claims in counseled cases. Prior case law indicates, however, that the Pennsylvania Supreme Court generally entertained the merits of supplemental pro se claims. The Commonwealth disagrees and argues that "the *Ellis* rule is well-known in Pennsylvania, and has been for a very long time." Appellee/Cross-Appellant's Br. at 61. In support of this assertion, the Commonwealth relies upon various decisions of the intermediate Superior Court from 1985 and earlier, indicating that pro se supplemental briefs had long been disfavored in the Superior Court. *Id.* The present case, however, is a capital proceeding, which entails an appeal taken directly to the Pennsylvania Supreme Court. It is thus irrelevant to our inquiry whether the intermediate Superior Court had a practice of rejecting pro se supplemental briefs in non-capital cases prior to the time of Holloway's appeal. As noted, Pennsylvania Supreme Court decisions around the time of Holloway's direct appeal are fully consistent with the record here that the Court assented to consideration of the pro se supplemental claims, including the *Batson* issue. We simply have no reason to believe that the Court refused to consider Holloway's pro se brief, particularly since such a refusal would have been contrary to its practice at the time.

The District Court rejected Holloway's argument of exhaustion on direct appeal primarily because it faulted Holloway for failing to raise his exhaustion argument during the PCRA proceedings. *Holloway III*, 161 F. Supp. 2d at 502 n.38. It is well-settled that "once [a] federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied." *Picard v. Connor*, 404 U.S. 270, 275 (1971). As discussed, "fair presentation" requires raising the federal claim itself; a petitioner has no

separate obligation to present a federal exhaustion argument to the state courts for review. Moreover, if a claim is exhausted on direct review but the state court fails to adjudicate the claim, the petitioner need not reassert the claim in a state post-conviction proceeding. Thus, Holloway's decision to reassert the *Batson* claim on PCRA review does nothing to diminish his exhaustion of the claim on direct appeal.

Even if the Pennsylvania Supreme Court were to have held on the PCRA appeal that Holloway's claim was previously litigated by virtue of the pro se direct appeal brief and therefore barred from state collateral review, such a finding would not have prevented a federal court from reaching the merits. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Lambert v. Blackwell*, 134 F.3d 506, 519-20 (3d Cir. 1997). It is "too obvious to merit extended discussion that whether the exhaustion requirement of 28 U.S.C. § 2254(b) has been satisfied cannot turn upon whether a state appellate court chooses to ignore in its opinion a federal constitutional claim squarely raised in petitioner's brief in the state court." *Smith v. Digmon*, 434 U.S. 332, 333 (1978) (per curiam); *see also McMahon v. Fulcomer*, 821 F.2d 934, 941 (3d Cir. 1987); *Swanger v. Zimmerman*, 750 F.2d 291, 295-96 (3d Cir. 1984). Thus, the Pennsylvania Supreme Court's failure to rule on the merits of Holloway's *Batson* claim on direct appeal can have no bearing on our exhaustion analysis. Consequently, we must reject the District Court's conclusion that Holloway "defaulted" his exhaustion argument by failing to raise that argument on PCRA review.

Holloway fairly presented and exhausted his *Batson* claim on direct appeal. "A petitioner who has raised an issue on direct appeal . . . is not required to raise it again in a state post-conviction proceeding." *Lambert*, 134 F.3d at 513; *see also Peoples v. Fulcomer*, 882 F.2d 828, 829 n.1 (3d Cir. 1989). Because Holloway's direct appeal exhaustion is sufficient in itself to bring the *Batson* claim before a federal habeas court for review, we turn to the merits of his claim.[5]

---

5. We note, in any event, that Holloway also exhausted the *Batson* claim on PCRA review, as he presented the claim in his Amended PCRA Petition and again on appeal to the Pennsylvania Supreme Court. Furthermore, as explained above, Holloway committed no default of the claim on PCRA review.

3. Scope of review

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a state prisoner's habeas petition must be denied as to any claim that was "adjudicated on the merits in State court proceedings" unless the adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2). We have interpreted § 2254(d)'s "adjudication on the merits" language to mean that "when, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA . . . do not apply." *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001); *see also Everett v. Beard*, 290 F.3d 500, 507-08 (3d Cir. 2002) ("The AEDPA standard of review does not apply unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States."). Holloway presented his *Batson* claim to the Pennsylvania Supreme Court on direct appeal, but the Court failed to even mention the claim (much less adjudicate the merits) in its disposition. *Cf. Hameen v. Delaware*, 212 F.3d 226, 248 (3d Cir. 2000) (claim was not "adjudicated on the merits" because Delaware Supreme Court failed to address it "even though it had the opportunity to do so"). Consequently, pre-AEDPA standards govern.

Additionally, pre-AEDPA standards govern our review even if we limit our analysis to the state court's ruling in the PCRA proceeding. The Pennsylvania Supreme Court treated Holloway's *Batson* argument on PCRA review solely as a claim of ineffective assistance of counsel because it believed that Holloway raised the *Batson* claim for the first time on the PCRA appeal. The record reflects, however, that Holloway in fact raised his *Batson* claim in the PCRA trial court. The Pennsylvania Supreme Court denied relief on the *Batson* claim for the following reasons:

[Holloway] claims that the Commonwealth used its peremptory strikes in a racially discriminatory manner in violation of [*Batson*]. However, [Holloway] has failed to make a record "identifying the race of venirepersons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury selected." *Commonwealth v. Bronshtein*, 547 Pa. 460, 691 A.2d 907, *cert. denied*, 522 U.S. 936 (1997). "Where an appellant fails to make a record for review of a *Batson* challenge, this Court is unable to consider a claim that the trial court failed to find a prima facie case under *Batson*." *Commonwealth v. Spence*, 534 Pa. 233, 627 A.2d 1176 (1993). Therefore, *it is impossible to determine if [Holloway]'s claim has arguable merit.* Moreover, [Holloway] does not even allege that counsel's ineffectiveness with respect to this issue "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). Accordingly, no relief is due.

*Holloway II*, 739 A.2d at 1045-46 (emphasis added).

Given that the state court found it "impossible to determine" whether Holloway's underlying *Batson* claim "has arguable merit," it plainly did not render an "adjudication on the merits" of that claim for purposes of applying the AEDPA standards. Accordingly, our review is under pre-AEDPA law with regard to the PCRA decision, as well.[6]

*Batson* claims present mixed questions of law and fact. *Riley v. Taylor*, 277 F.3d 261, 277 (3d Cir. 2001) (en banc). Under pre-AEDPA standards, the legal conclusions of state courts are reviewed de novo. *McCandless*, 172 F.3d at 260. We must presume that the state court's factual findings are correct unless, *inter alia*, they are not " 'fairly supported by the record.' " *Pemberthy v. Beyer*, 19 F.3d 857, 864 (3d Cir. 1994) (quoting 28 U.S.C. § 2254(d)(8)). "[T]he question in a federal habeas proceeding is not whether the federal courts

---

6. As explained below, our result would be the same on the *Batson* issue even if we reviewed the claim under the deferential AEDPA standards.

agree with the state court's factual finding, but whether that finding is fairly supported by the record." *Meyers v. Gillis*, 93 F.3d 1147, 1149 (3d Cir. 1996).

4. The *Batson* standard[7]

The Supreme Court reaffirmed in *Batson* the long-standing principle that the Fourteenth Amendment's Equal Protection Clause prohibits a prosecutor from using a peremptory challenge to strike a prospective juror solely on account of race. 476 U.S. at 88. As the Court explained, "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Id.* at 87.

*Batson*'s primary significance lay in the Court's repudiation of the evidentiary burden that it had previously placed on defendants in making an equal protection claim. In *Swain v. Alabama*, 380 U.S. 202 (1965), the Court had held that a defendant could make a prima facie case of purposeful discrimination only by showing that a prosecutor, "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries." *Id.* at 223. *Batson* rejected the *Swain* standard in favor of a three-part burden-shifting process by which a trial court can evaluate an objection to race-based juror exclusion in light of events as they occur in the case before it. The Court explained the process as follows:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for

7. The Supreme Court issued *Batson* on April 30, 1986, approximately two weeks before jury selection commenced at Holloway's trial. Holloway, therefore, was plainly entitled to the benefit of the *Batson* decision.

striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003) (citations to *Batson* omitted).

Under *Batson*, although "a defendant has no right to a petit jury composed in whole or in part of persons of his own race . . . the defendant does have the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson*, 476 U.S. at 85-86 (internal quotations, citations, and footnote omitted). Consistent with this principle, courts have recognized that a prosecutor's purposeful discrimination in excluding even a single juror on account of race cannot be tolerated as consistent with the guarantee of equal protection under the law. *See Harrison v. Ryan*, 909 F.2d 84, 88 (3d Cir. 1990) (holding that relief must be granted under *Batson* "when even one black person is excluded for racially motivated reasons"); *see also United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994) (recognizing that "the Constitution forbids striking even a single prospective juror for a discriminatory purpose"); *United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir. 1987) ("[W]e emphasize that under *Batson*, the striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors."). Moreover, a prosecutor who intentionally discriminates against a prospective juror on the basis of race can find no refuge in having accepted others venirepersons of that race for the jury. *See Lancaster v. Adams*, 324 F.3d 423, 434 (6th Cir. 2003) ("Where purposeful discrimination has occurred, to conclude that the subsequent selection of an African-American juror can somehow purge the taint of a prosecutor's impermissible use of a peremptory strike to exclude a venire member on the basis of race confounds the central teachings of *Batson*."), *cert. denied*, 124 S. Ct. 535 (2003).

5. Holloway's *Batson* challenge and the prosecutor's explanations

Holloway first objected to the prosecutor's peremptory strikes on the second day of the voir dire proceedings, after the prosecutor struck Brenda Forrest, an African-American female. Holloway's counsel noted, "I believe the District Attorney has now used all his challenges on black jurors. I believe he has developed a pattern of striking them." App. Vol VII at 1355. The trial court deferred a discussion of the issue because another prospective juror was entering the courtroom, and jury selection continued. After several additional potential jurors were struck by agreement or for cause, Holloway's counsel formally asserted his objection, stating, "I think the District Attorney has now developed a pattern of striking only black prospective jurors. I think that pattern has now developed, and there are nine jurors selected, and two black jurors out of that particular nine. And I would ask for a mistrial and [to] start all over again." App. Vol. VII at 1367-68.

Without indicating whether it thought Holloway established a prima facie case, the trial court invited a response from the prosecutor, asking, "Does the Commonwealth have anything to say at this time?" *Id.* at 1368. The prosecutor replied, "Sure, Judge. As [defense counsel] has indicated, number one, we have nine seated in the box, two of them [sic] whom are black. One black male and one black female. [Counsel] is incorrect when he tells the Court that I have used my pre-empts exclusively on blacks, that's not true. I've struck a white woman also." *Id.* The trial judge then observed that Holloway too had used a peremptory strike against a black female the previous day.[8] After a brief discussion with Holloway as to the reasons why he excluded that potential black juror, *id.* at 1368-69, the trial court ended the matter without expressly ruling on whether the prosecutor had struck African-Americans

---

8. In *Batson*, the Supreme Court expressed no view on whether the Constitution imposed any limitation upon a criminal defendant's exercise of peremptory challenges. 476 U.S. at 89 n.12. Several years after *Batson*, the Court held in *Georgia v. McCollum*, 505 U.S. 42, 56 (1992), that prosecutors may assert such a *Batson* challenge.

because of their race. The judge concluded, "[Holloway] also knocked off a potential black juror, but the record will speak for itself." *Id.* at 1369. At that point in the proceedings, the record was clear that the prosecutor had used seven of eight peremptory strikes against African-Americans.

The prosecutor subsequently exercised four additional peremptory strikes, all against African-Americans. After the first of those strikes, against Starlett Sandoval, Holloway's counsel noted for the record that "the Commonwealth has struck another black juror." *Id.* at 1376. The prosecutor offered no explanation for the strike, nor did the court request one. The prosecutor later struck Robert Keel, after which defense counsel noted, "Let the record indicate a black male." *Id.* at 1397. Without prompting from the trial court, the prosecutor elected to explain the strike, stating, "May the record indicate a single, young, unemployed, on welfare, black male." *Id.* The prosecutor next used a peremptory strike against John Hackley, Sr., and Holloway again noted the venireperson's race. App. Vol. VIII at 1488. The prosecutor explained, "Let the record further show that it is a black juror, black male juror approximately the same age as the defendant." *Id.* Finally, the prosecutor exercised a peremptory strike against Elouise Baldi, and after Holloway made note of her race, the prosecutor explained that she was "a Black female, whose brother-in-law was convicted of narcotics charges. Narcotics would play a central role in the testimony of this case." *Id.* at 1493-94.

The matter proceeded to trial with a jury of nine white jurors and three black jurors, with two white alternate jurors.[9] Holloway renewed his *Batson* challenge, albeit in a cursory fashion, in a post-verdict motion for a new trial.[10]

---

9. There was some confusion in the state court proceedings as to the racial composition of the jury, with Holloway arguing in the PCRA proceeding that the jury consisted of ten white jurors and two black jurors. It became clear in this federal habeas proceeding that the final composition was actually nine white jurors and three black jurors. This discrepancy in the final numbers, however, is not material to our analysis under *Batson*.

10. Holloway's trial counsel, Barry Denker, Esq., filed the motion for a new trial but was unable to argue the motion or to file a brief in support.

The trial court summarily rejected the post-trial *Batson* argument as "unspecific."

6. Merits Analysis

A.

We have little difficulty in concluding that Holloway met his burden under the first step of the *Batson* analysis. A court should consider "all relevant circumstances" in assessing whether a prima facie showing of discrimination has been made. *Batson,* 476 U.S. at 96. This Court has identified five factors that are generally relevant in this inquiry: "1) the number of racial group members in the panel; 2) the nature of the crime; 3) the race of the defendant; 4) a pattern of strikes against racial group members; and 5) the questions and statements during the voir dire." *United States v. Clemons,* 843 F.2d 741, 748 (3d Cir. 1988).

The most striking factor in this case is the prosecutor's pattern of strikes. Holloway moved for a mistrial after the prosecutor had used seven of eight peremptory strikes against African-Americans; the Commonwealth ultimately used eleven of twelve strikes in that manner. As the Court explained in *Batson,* "a 'pattern' of strikes against black jurors in the particular venire might give rise to an inference of discrimination." 476 U.S. at 97. The pattern here was certainly strong enough to suggest an intention of keeping blacks off the jury. *Cf. Harrison,* 909 F.2d at 87 (finding prima facie case where prosecutor used six of eight peremptory challenges against African-Americans); *see also Clemons,* 843 F.2d at 747 (recognizing that "[s]triking a single black juror could constitute a prima facie case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks").

---

Holloway was represented at a hearing on the motion by an associate of Denker's who had not entered an appearance at trial. Denker had become unavailable to Holloway shortly after trial because he entered the Federal Witness Protection Program following his federal convictions for bribing Philadelphia judges and court officials.

In addition, for purposes of a prima facie showing, Holloway is entitled "to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson*, 476 U.S. at 96 (quoting *Avery v. Georgia*, 345 U.S. 559, 562 (1953)). In responding to Holloway's motion for a mistrial, the prosecutor agreed as to the racial composition of the nine jurors seated to that point (seven whites, two blacks), and explained that he had not used his "pre-empts exclusively on blacks" because he had "struck a white woman also." App. Vol. VII at 1368. This explanation, however, did nothing to dispel Holloway's suggestion that the prosecutor harbored a discriminatory intent in striking the seven prospective black jurors. A prosecutor cannot undermine a pattern of strikes that appears racially motivated by merely pointing to a lone juror of a different race whom he also found objectionable. A prosecutor also cannot "rebut the defendant's case merely by denying that he had a discriminatory motive or affirming his good faith in making individual selections." *Batson*, 476 U.S. at 98 (internal quotation marks and citation omitted). A further relevant circumstance here is that while Holloway, the victim, and key prosecution witness Shirley Baker were all black, the officer who took Holloway's custodial statement, Detective Gilbert, was white. Given that Holloway's defense would rise or fall largely on his claim that the custodial statement was fabricated, Holloway's credibility versus that of Detective Gilbert, a white police officer, was a crucial issue for the jury.[11]

---

11. We note that Holloway did not establish the number of blacks in the venire during the course of the state court proceedings. The parties were able to ascertain the composition in this habeas proceeding, largely by relying on the prosecutor's voir dire notes once they were turned over to Holloway as part of the limited discovery conducted before the District Court. Eighty-seven potential jurors were questioned during the voir dire, forty-two of whom were struck for cause. Of the remaining forty-five potential jurors, the defense struck nine before the prosecutor had an opportunity to use a peremptory challenge. The parties agree that of the thirty-six venirepersons the prosecutor had an opportunity to strike, fourteen were black and twenty-two were white. The prosecutor, as noted, used eleven strikes against blacks. Thus, the prosecutor struck eleven of the fourteen blacks he had an opportunity to strike.

In short, there was "sufficient reason to believe that discrimination may have been at work here to require the state to come forward with an explanation of its actions." *Johnson*, 40 F.3d at 666. The trial court, as noted, did ask the prosecutor for an explanation following Holloway's motion for a mistrial, but we cannot infer from the court's question — "Does the Commonwealth have anything to say at this time?" — that it found a prima facie case. The court's query suggests that the Commonwealth was under no obligation to provide any response at all, thereby indicating that the second stage of the *Batson* inquiry had not been reached. If anything, we can assume the trial court found no prima facie case because it allowed the matter to proceed without explanation from the Commonwealth as to the basis for the individual strikes. Insofar as the trial court found no evidence sufficient to support a prima facie showing of discrimination, we must reject that unexplained determination as inconsistent with *Batson* and not fairly supported by the record.

Significantly, we have recognized that the question of whether a prima facie case has been established becomes moot, and thus need not even be addressed, when the prosecutor provides explanations for the strikes despite the absence of a request from the trial court. *See Johnson*, 40 F.3d at 663-65. We have explained that,

> independent of the strength of the evidence tendered as a prima facie case, once a prosecutor attempts to explain a peremptory challenge, we believe the trial and reviewing courts should look to the entire record to determine if intentional discrimination is present. If the prosecutor's explanation raises more concern than it puts to rest, courts cannot effectively close their eyes to that fact by simply deciding that the defendant has not made out a prima facie case.

Although this evidence further supports Holloway's prima facie showing, it is by no means necessary to establish a prima facie showing under *Batson* given the other evidence of record. Moreover, because Holloway failed to develop this information in state court, we do not consider it here.

*Clemmons*, 892 F.2d at 1156; *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."). Thus, based on the prosecutor's explanations alone, the trial court should have reached the second and third steps in the *Batson* inquiry in this case.

The second *Batson* step requires that the prosecutor provide a "neutral, nonpretextual explanation for striking the black venirepersons from the venire panel." *Jones*, 987 F.2d at 973. After the motion for a mistrial was rejected, Holloway duly noted each peremptory challenge exercised against an African-American, and the prosecutor elected to make a record of his reasons for three of those four strikes. Although we are troubled by the lack of race-neutrality in each of the prosecutor's explanations, and perhaps more troubled by the lack of any explanation at all for eight of his eleven strikes, the explanation given as to venireperson John Hackley, Sr., was plainly insupportable under *Batson* and warrants relief.

The prosecutor explained the Hackley strike on the ground that Hackley "is a black juror, black male juror approximately the same age as the defendant." In other words, the prosecutor cited Hackley's race, age, and gender as the reasons for the strike. Race, obviously, was impermissible, but we will assume that the prosecutor referred to Hackley's race merely as a concession that Hackley was black so that his race would be clear as a matter of record. Thus, we focus on the prosecutor's stated reasons of age and gender.[12] This Court has firmly established that "[a] comparison between a stricken black

12. In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), the Supreme Court extended *Batson* to prohibit discrimination on the basis of gender. Holloway's objection to the exclusions here, however, centered solely on race, and thus we limit our analysis accordingly. We note, nevertheless, the Court's observation in *J.E.B.* that "[b]ecause gender and race are overlapping categories, gender can be used as a pretext for racial discrimination." *Id.* at 145.

juror and a sitting white juror is relevant to determining whether the prosecution's asserted justification for striking the black juror is pretextual." *Riley v. Taylor*, 277 F.3d 261, 282 (3d Cir. 2001) (en banc). Hackley was born in 1950 and thus was nine years younger than Holloway, who was born in 1941. Using this nine-year measure for age proximity, the record shows the prosecutor accepted three white jurors "approximately the same age" as Holloway, two of whom were males — Joseph Zingone (born 1935), Patricia Connor (1948), and John Jackubiak (1943). In addition, he chose not to exercise a peremptory strike against four other white jurors (one male) of approximately the same age who ultimately did not serve on the jury — Thomas St. Joseph (1941), Blanche Cohen (1933), Kathleen Fallon (1940), and Dolores Kovack (1937). "The presence of white jurors who possessed the same characteristic indicates that this explanation was pretextual." *Jones*, 987 F.2d at 973. We find nothing in the prosecutor's explanation of the Hackley strike, or in the record as a whole, to indicate that he harbored anything but a discriminatory intent to remove Hackley because of his race.

The Commonwealth defends the Hackley strike by looking to the voir dire transcript for information that might have motivated the prosecutor's decision beyond the reasons stated on the record. In particular, the Commonwealth notes that Hackley indicated that he lived in the neighborhood where the murder took place and knew "some people around that neighborhood . . . but not by the names." App. Vol. VIII at 1485. The Commonwealth suggests that "[t]he prosecutor could well have been concerned that Mr. Hackley's similarity in age and his connections to the neighborhood could translate into familiarity with 'some of the people' involved in the case." Appellee/Cross-Appellant's Br. at 73. This speculation, however, does not aid our inquiry into the reasons the prosecutor actually harbored for the Hackley strike. *Batson* is concerned with uncovering purposeful discrimination, and where a prosecutor makes his explanation for a strike a matter of record, our review is focused solely upon the reasons given. As we noted in *Riley*, "[a]pparent or potential reasons do not shed any light on the prosecutor's intent or state of mind when making the peremptory challenge." 277

F.3d at 282. Thus, the Commonwealth's attempt to recast the prosecutor's stated reasons must be rejected.

In any event, Hackley's statements during voir dire give no indication of an independent basis for the prosecutor's action. Although Hackley lived in the neighborhood where the murder took place, the prosecutor explored that fact with a single question seeking an assurance that Hackley's residence would not influence his consideration of the case. App. Vol. VII at 1485. Hackley stated that he was "sure" it would have no influence. *Id.* Hackley was also unequivocal in stating that he could impose the death penalty if warranted. He noted that he was married with two teenage children and held steady employment, and he stated that he could be fair to both sides in hearing the case. The prosecutor, nevertheless, exercised the peremptory strike after defense counsel indicated that he had no questions for Hackley. On this record, we could not impute a proper motive to the prosecutor's action even if it were proper to hypothesize potential reasons for the strike beyond those given. Relief, therefore, must be granted.

We are not unmindful that the state trial court failed to acknowledge or expressly follow the three-step *Batson* analysis in this case. In particular, the court never formally asked the prosecutor to provide a full explanation for the strikes. Ordinarily, an evidentiary hearing at which the prosecutor might rely upon his recollection of the voir dire and make reference to his trial notes would seem warranted. Here, however, the parties agree that the prosecutor is "psychiatrically disabled" and has been for some time, and thus would be unable to testify meaningfully at a hearing. Holloway's trial counsel is deceased (as noted, he became unavailable shortly after the trial), as is the presiding trial judge. It seems unlikely at this stage — some seventeen years after the trial — that the prosecutor, even were he not "disabled," could accurately recall his reasons for the strikes or provide meaningful elaboration upon the reasons that he placed on the voir dire record. Furthermore, given the unavailability of the relevant participants, there would be no benefit to a hearing at this point. *See Riley*, 277 F.3d at 293-94. The long delay in reaching this stage is certainly regrettable, both for the

Commonwealth and for Holloway, but we cannot fault Holloway, who has pursued the *Batson* argument at every stage of this case since the time of trial in 1986.

### B.

Although it did not address the *Batson* claim on direct appeal, the Pennsylvania Supreme Court rejected the claim on PCRA appeal because it found that Holloway failed to make a record identifying (1) the race of venirepersons stricken by the Commonwealth, (2) the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and (3) the racial composition of the final jury selected. *Holloway II*, 739 A.2d at 1045 (citing *Commonwealth v. Bronshtein*, 691 A.2d 907 (Pa. 1997)). The Court explained that, "[w]here an appellant fails to make a record for review of a *Batson* challenge, this Court is unable to consider a claim that the trial court failed to find a prima facie case under *Batson*." *Id.* (citing *Commonwealth v. Spence*, 627 A.2d 1176 (Pa. 1993)). We find this analysis inconsistent with the teachings of *Batson*.

The state court's rejection of Holloway's claim for want of evidentiary support was an application of what the parties here call the "*Spence* rule." In *Commonwealth v. Spence*, the Pennsylvania Supreme Court affirmed the denial of a capital defendant's *Batson* claim on the ground that he failed to make an adequate record to permit meaningful review of the trial court's failure to find a prima facie case. 672 A.2d at 1183. The Court observed that the defendant had not "specifically identif[ied] the race of all the veniremen who had been removed by the prosecution, the race of all the jurors who served, or the race of jurors acceptable to the Commonwealth who had been stricken by the defense." *Id.* at 1182-83. Applying this rule, the Court noted the defendant's claim that ten of twelve Commonwealth peremptory strikes were used against African-Americans, but it denied relief because the defendant had identified for the record only four, not ten, potential jurors as being black. *Id.*

The evidentiary requirements set forth in *Spence* — that the defendant identify the race of all veniremen removed by

the prosecution, the race of all the jurors who served, and the race of jurors acceptable to the Commonwealth but struck by the defense — seem to have developed under Pennsylvania law into a standard for assessing whether a defendant can make a prima facie showing of purposeful discrimination so as to move beyond the first step in the *Batson* analysis. For example, in *Commonwealth v. Bronshtein*, 691 A.2d 907 (Pa. 1997), which was cited to support the rejection of Holloway's *Batson* claim, the Pennsylvania Supreme Court explained the rule as follows: "In order to establish a prima facie case on a *Batson* claim, defendant must make a record identifying the race of venirepersons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury selected." *Id.* at 915.

In *Commonwealth v. Simmons*, 662 A.2d 621, 631 (Pa. 1995), the Court fully explained the workings of the *Spence* rule and its role in the *Batson* analysis:

> To sustain a prima facie case of improper use of peremptory challenges, a defendant must establish the following: (1) the defendant is a member of a cognizable racial group and the prosecutor exercised peremptory challenges to remove members of the defendant's race from the venire; (2) the defendant can then rely on the fact that the use of peremptory challenges permits those to discriminate who are [of] a mind to discriminate; and, (3) the defendant, through facts and circumstances, must raise an inference that the prosecutor excluded members of the venire on account of their race. *Commonwealth v. Dinwiddie*, 601 A.2d 1216, 1218 (1992). This third prong requires defendant to make a record specifically identifying the race of all the venirepersons removed by the prosecution, the race of the jurors who served and the race of jurors acceptable to the Commonwealth who were stricken by the defense. After such a record is established, the trial court must consider the totality of the circumstances to determine whether challenges were used to exclude venirepersons on account of their race. If the trial court finds in the affirmative, it may then require the

>  prosecutor to explain his or her reasons for the challenge.

*Id.* at 631. Thus, as *Simmons* and subsequent cases make clear, to raise an inference of discrimination in support of a prima facie *Batson* showing, a Pennsylvania defendant must first make a record under the *Spence* rule. *See Commonwealth v. Marshall*, 810 A.2d 1211, 1216 (Pa. 2002); *Commonwealth v. Baez*, 720 A.2d 711, 736 (Pa. 1998); *Commonwealth v. Gibson*, 688 A.2d 1152, 1159 (Pa. 1997); *Commonwealth v. Jones*, 668 A.2d 491, 518 (Pa. 1995); *Commonwealth v. Johnson*, 668 A.2d 97, 102 (Pa. 1995); *Commonwealth v. Hill*, 727 A.2d 578, 582 (Pa. Super. Ct. 1999).[13]

In *Batson*, the Supreme Court discussed the requirements for a prima facie case in the following terms:

>  To establish such a case, the defendant first must show that he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." . . . Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

---

13. In some recent cases, usually those involving claims of improper exclusions based on gender, the Pennsylvania Supreme Court has expanded the three *Spence* categories to require two additional showings in order to state a prima facie case—the race (or gender) of all venirepersons remaining after challenges for cause, and the race (or gender) of all the venirepersons in the jury pools. *See, e.g., Commonwealth v. Rico*, 711 A.2d 990, 993 (Pa. 1998); *Jones*, 668 A.2d at 518. In other recent cases, however, the Court has invoked only the original three categories. *See, e.g., Marshall*, 810 A.2d at 1216; *Commonwealth v. Hackett*, 735 A.2d 688, 694 (Pa. 1999).

In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson*, 476 U.S. at 96-97.

The *Batson* standard for assessing a prima facie showing is fluid, mainly because it places great confidence in the ability of trial judges to assess whether discrimination is at work based on the evidence at hand. The judge's assessment "largely will turn on evaluation of credibility," *id.* at 98 n.21, and "[t]he analysis set forth in *Batson* permits prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process." *Hernandez v. New York*, 500 U.S. 352, 358 (1991). The defendant's burden at the initial stage is to show merely that jurors of his race have been struck and that the strikes are indicative of an improper motive. The defendant generally meets this burden if there is a pattern of strikes or if the prosecutor's questions and statements during voir dire support an inference of discriminatory purpose. Notably absent from the *Batson* discussion of the prima facie case is any call for trial judges to seek the type of statistical accounting required by the *Spence* rule — nor do we see how such an accounting fits within *Batson's* first step. A trial judge undoubtedly might find in a given case that a full accounting regarding the race of the venire and the jurors struck would be helpful at the third stage of the *Batson* analysis, after it has heard the prosecutor's explanation for the strikes and must "determine if the defendant has established purposeful discrimination." *Id.* at 98. But requiring the presentation of such a record simply

to move past the first stage in the *Batson* analysis places an undue burden upon the defendant.

Under the *Batson* process, a defendant must identify the race of the venireperson struck if he wishes to raise a challenge to the strike based on race. If the defendant is claiming a pattern of strikes to support an inference of discrimination, then a record of the race-based strikes that preceded the objection is also required. But a defendant's *Batson* objection need not always be based on a "pattern" of strikes; it can be based, for example, on a single strike accompanied by a showing that the prosecutor's statements and questions to the juror (or to prior jurors) support an inference of discrimination. Requiring a defendant in that circumstance to identify "the race of all the venirepersons removed by the prosecution" is not necessary to support a prima facie case, and places an irrelevant hurdle in the way of reaching the second step in the *Batson* process.

Similarly, and perhaps more troubling, is the requirement that defendants support a prima facie case by identifying "the race of the jurors who served and the race of jurors acceptable to the Commonwealth who were stricken by the defense." *Simmons*, 662 A.2d at 631. As noted, *Batson* is premised on the fact that defendants "have the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria," and the "Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race." *Batson*, 476 U.S. at 85-86. The final composition of the jury (or even the composition of the jury at the time the *Batson* objection is raised) offers no reliable indication of whether the prosecutor intentionally discriminated in excluding a member of the defendant's race. Indeed, the composition of a jury is decided by many factors, including the defendant's use of peremptory challenges, challenges for cause, and jurors' claims of hardship. Thus, "a *Batson* inquiry focuses on whether or not racial discrimination exists in the striking of a black person from the jury, not on the fact that other blacks may remain on the jury panel." *United States v. Johnson*, 873 F.2d 1137, 1139 n.1 (8th Cir. 1989). A defendant can make a prima facie case of discrimination without reference to the jury's racial makeup.

Likewise, evidence of "the race of jurors acceptable to the Commonwealth who were stricken by the defense," *Simmons*, 662 A.2d at 631, finds no place in the prima facie case, as defense strikes are irrelevant to the determination of whether the prosecutor has engaged in discrimination. *Batson* nowhere suggests that a defendant must support his challenge to the prosecutor's actions by showing that he has "clean hands," or by admitting that he too struck black jurors from the jury (which is what the trial court here seemed to ask of Holloway when it raised the fact that Holloway had also struck a black juror from the venire). While *Batson* permits a trial judge to focus at the prima facie stage upon "all *relevant* circumstances," the nature of a defendant's strikes fails the test for relevancy. Instead, the focus properly falls on the prosecutor's actions, looking primarily at whether there is a pattern of strikes and whether the prosecutor's questions and statements support or refute an inference of discrimination.

In the instant case, the Pennsylvania Supreme Court determined that Holloway's failure to comply with the *Spence* rule rendered the Court "unable to consider a claim that the trial court failed to find a prima facie case under *Batson*." *Holloway II*, 739 A.2d at 1045. As a result, the Court found it "impossible to determine if [Holloway]'s claim has arguable merit." *Id.* Given the record Holloway established on the *Batson* claim during voir dire, we conclude that he stated not only a prima facie case, but also an entitlement to relief under *Batson*'s third step. The voir dire transcript reflects a sufficient "pattern" of strikes at the time of the motion for a mistrial (seven of eight), as well as the prosecutor's evasive statement in response. The record also reflects the prosecutor's inadequate explanations as to three of the four strikes, particularly the Hackley strike, to which Holloway subsequently objected. Thus, there was ample evidence under *Batson*'s first step from which the Pennsylvania Supreme Court could have assessed whether the trial court erred in failing to find a prima facie case. The Court's finding of an insufficient record is not fairly supported and is inconsistent with *Batson*'s mandate.

As a final matter, we note that relief would be warranted even if our analysis were confined by the requirements of

AEDPA, as the Pennsylvania Supreme Court's PCRA decision was "contrary to" and an "unreasonable application of" the *Batson* standard. "A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Application of the *Spence* rule is at odds with *Batson*'s first step because it places a burden upon the defendant to make a record of largely irrelevant information in order to raise an inference that the prosecutor excluded members of the venire on account of race. The *Spence* rule runs contrary to federal law insofar as it prevents a court from shifting the burden to the prosecutor upon a defendant's showing, based on the factors required by *Batson*, that discrimination is at work. In that the *Spence* rule provided a justification for refusing to reach the merits of Holloway's prima facie case, the Pennsylvania Supreme Court engaged in an unreasonable application of the clearly established *Batson* standard. Accordingly, we must reject the Pennsylvania Supreme Court's PCRA disposition under AEDPA, as well.

## **IV.** Conclusion

For the reasons stated, the judgment of the District Court entered on August 27, 2001, will be reversed. The matter will be remanded to the District Court with instructions to issue a writ of habeas corpus conditioned upon the Commonwealth's right to conduct a retrial within 120 days from entry of the District Court's order granting the petition.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*
